FILED

## UNITED STATES DISTRICT COURT -
## FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

2016 APR 21 P 2:12

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

REGINALD CORNELIUS LATSON,

        Plaintiff,

    v.

HAROLD W. CLARKE (official and individual capacity), MARION CORRECTIONAL TREATMENT CENTER, DARA ROBICHAUX (official and individual capacity), LARRY JARVIS (official and individual capacity), COMMONWEALTH OF VIRGINIA, VIRGINIA DEPARTMENT OF CORRECTIONS, RAPPAHANNOCK REGIONAL JAIL, RAPPAHANNOCK REGIONAL JAIL AUTHORITY, JOSEPH HIGGS, JR. (official and individual capacity), PHIL GRIMES (official and individual capacity), WILLIAM DIEHL (individual capacity), and DOES 1-100,

        Defendants.

Civil No. 1:16CV447-GBL|MSN

**JURY TRIAL DEMANDED**

## COMPLAINT FOR THE RECOVERY OF DAMAGES
## CAUSED BY THE DEPRIVATION OF CIVIL RIGHTS

1.    This is an action for violations of Plaintiff Reginald Cornelius Latson's rights under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983 ("Section 1983"), the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and Title II of the Americans with Disabilities Act of 1990 ("ADA"), 21 U.S.C. § 12131, *et seq.*

## INTRODUCTION

2.    Mr. Latson is a 24-year-old African-American man who has been diagnosed with Autism Spectrum Disorder ("ASD") and intellectual disability ("ID"). Despite being well aware

1

of his disabilities, for a period of almost three years, Defendants subjected Mr. Latson to a series of inhumane conditions while held in the Virginia correctional system.

3.     The Virginia correctional facilities in which Mr. Latson was housed were largely unequipped to accommodate the basic needs of an individual with Mr. Latson's disabilities—nor were Defendants willing to even attempt to make appropriate accommodations. Instead, as Mr. Latson's advocates had warned since day one, Mr. Latson's placement into a generalized, non-accommodating correctional setting would—and ultimately did—aggravate Mr. Latson's ASD and ID and result in severe mental and emotional distress.

4.     Further exacerbating Mr. Latson's distress were the inhumane and excessively harsh conditions under which he was kept while incarcerated at these institutions, including:

- Confinement to a windowless cell with no mattress, only a hole in the ground for a toilet, and the lights left on 24 hours per day;

- Extended periods without basic toiletries such as toilet paper;

- Virtually complete isolation from human contact or any meaningful stimulation, without access even to books or music;

- Multiple physical assaults including at least one incident involving the use of a Taser;

- Extended confinement to a restraint chair; and

- Perhaps most injuriously, extended periods of solitary confinement—including one stretch exceeding five months of almost exclusive solitary confinement.

5.     Frequently, prison officials attempted to justify these harsh conditions, such as Mr. Latson's prolonged solitary confinement, by claiming they were necessary to protect Mr. Latson from the general jail or prison population, or that Mr. Latson had to "earn" the right to have basic stimulus or amenities through "good behavior" (*i.e.*, behave like a "normal" inmate despite his disabilities). Such explanations, however, further demonstrate the Defendants' deliberate disregard for the impact such environments can have on an individual with ASD and

ID, and serve to underscore how fundamentally inappropriate these environments were for an individual like Mr. Latson.

6. Thanks to the tireless advocacy of family and lawyers and the resulting public attention, and only after a formal pardon from Virginia Governor McAuliffe, Mr. Latson finally was moved to a residential treatment facility.

7. Mr. Latson suffered for these years under conditions that are widely recognized—by courts, legislators, and President Obama himself—as being cruel and unusual, and fundamentally at odds with the principles of the American justice system and civilized society. These years while incarcerated took a drastic toll on Mr. Latson during a critical point in his development and have resulted in irreparable harm, aggravating his known mental and emotional conditions, creating new and harmful disabilities, and utterly derailing the acquisition of life skills that could have permitted Mr. Latson to function as an independent adult. As a result, Mr. Latson, by and through his undersigned counsel, hereby files the above-captioned Complaint and alleges the following.

## JURISDICTION

8. This action arises under the authority vested in this Court by virtue of 42 U.S.C. §§ 1983 and 1988; 29 U.S.C. § 701 *et seq.*; 42 U.S.C. § 12131 *et seq.*; and 28 U.S.C. §§ 1331 and 1343.

## VENUE

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because during the relevant time period, Plaintiff was imprisoned or jailed in Virginia and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

10.    Plaintiff Reginald Latson is and was at all times relevant to the events alleged in this Complaint, a citizen of the United States and a resident of the Commonwealth of Virginia. Mr. Latson has been diagnosed with ID and ASD.  These conditions substantially limit several of his major life activities, including but not limited to learning, concentrating, thinking, communicating, interacting with others, caring for himself, and working.  Mr. Latson also has a record of such impairments and is and was regarded by Defendants as having such impairments.

### Rappahannock Defendants
*(Rappahannock Regional Jail, Rappahannock
Regional Jail Authority, Higgs, Grimes, and Diehl)*

11.    Defendant Rappahannock Regional Jail (the "Rappahannock Jail") is in Stafford, Virginia where Mr. Latson was confined from approximately April 21, 2014 until he was transferred to co-Defendant Marion Correctional Treatment Center around June 5, 2014.

12.    Defendant Rappahannock Regional Jail Authority is the governing body for the Rappahannock Regional Jail network and operates the Rappahannock Jail.

13.    The Rappahannock Jail and Rappahannock Regional Jail Authority receive and benefit from federal financial assistance as that term is used in 29 U.S.C. § 794, including through the Prison Rape Elimination Act and other sources.

14.    Defendant Joseph E. Higgs, Jr. is the Superintendent of Rappahannock Jail.  As such, he was responsible for the custody and care of Mr. Latson and all prisoners in the Rappahannock Jail and had a clearly established, non-delegable constitutional duty not to be deliberately indifferent to the health and well-being of the inmates confined in the jail. Defendant Higgs supervises all employees at the Rappahannock Jail and has authority for the establishment and implementation of all policies and procedures at the institution.  At all times

relevant to the subject matter of this litigation, Defendant Higgs was acting under color of state law in his capacity as the Superintendent of Rappahannock Jail.

15.    Defendant Phil Grimes is the Deputy Superintendent of Rappahannock Jail. As such, he had a clearly established, non-delegable constitutional duty not to be deliberately indifferent to the health and well-being of the inmates confined in the jail. At all times relevant to the subject matter of this litigation, Defendant Grimes was acting under color of state law in his capacity as the Deputy Superintendent of Rappahannock Jail.

16.    Defendant William Diehl was a First Sergeant at Rappahannock Jail at all times relevant to the claim against him. As such, he had a clearly established, non-delegable constitutional duty not to be deliberately indifferent to the health and well-being of the inmates confined in the jail. At all times relevant to the subject matter of this litigation, Defendant Diehl was acting under color of state law in his capacity as a First Sergeant.

17.    Defendants Higgs and Grimes are being sued for damages under Section 1983 in their individual capacities and under the ADA and Rehabilitation Act in their official capacities.

18.    Defendant Diehl is being sued for damages under Section 1983 in his individual capacity.

19.    Defendants Rappahannock Jail and Rappahannock Regional Jail Authority are being sued for damages under Section 1983, the ADA, and the Rehabilitation Act. On information and belief, at all relevant times agents and employees of Defendants Rappahannock Jail and Rappahannock Regional Jail Authority were acting pursuant to municipal policy and/or practice.

## Commonwealth Defendants

*(Marion Correctional Treatment Center, Commonwealth of Virginia,
Virginia Department of Corrections, Robichaux, Jarvis, and Clarke)*

20.     Defendant Marion Correctional Treatment Center ("Marion CTC") is a medium security state prison or correctional facility in Marion, Virginia where Mr. Latson was confined from on or around June 5, 2014 until he was transferred to AdvoServ on or around February 2, 2015 following a conditional pardon by Virginia Governor Terry McAuliffe.

21.     Defendant Commonwealth of Virginia, through Defendant Virginia Department of Corrections ("VDOC"), operates the Marion CTC.

22.     Upon information and belief, the Marion CTC through VDOC receives and benefits from federal financial assistance as that term is used in 29 U.S.C. § 794, including through the Prison Rape Elimination Act and other sources.

23.     Defendant Dara Robichaux is currently the Warden of Marion CTC, and upon information and belief also served as Assistant Warden during a portion of Mr. Latson's incarceration.  As such, she was responsible for the custody and care of Mr. Latson and all prisoners in the Marion CTC and had a clearly established, non-delegable constitutional duty not to be deliberately indifferent to the health and well-being of the inmates confined in the prison. She supervises all employees at Marion CTC and has authority for the establishment and implementation of all policies and procedures at the institution.  At all times relevant to the subject matter of this litigation, Defendant Robichaux was acting under color of state law in her capacity as Warden of the Marion CTC.

24.     Defendant Larry Jarvis was the Warden of Marion CTC during the time of Mr. Latson's incarceration.  As such, he was responsible for the custody and care of Mr. Latson and all prisoners in the Marion CTC and had a clearly established, non-delegable constitutional duty

not to be deliberately indifferent to the health and well-being of the inmates confined in the prison. He supervised all employees at Marion CTC and had authority for the establishment and implementation of all policies and procedures at the institution. At all times relevant to the subject matter of this litigation, Defendant Jarvis was acting under color of state law in his capacity as Warden of the Marion CTC.

25.  Defendants Marion CTC, VDOC, and the Commonwealth of Virginia are being sued for damages under the ADA and the Rehabilitation Act.

26.  Defendant Harold W. Clarke is the Director of VDOC and as such, was responsible for the custody and care of Mr. Latson while he was incarcerated in the Marion CTC within VDOC. He oversees all employees in VDOC and has authority to establish, alter, and implement all policies and procedures within VDOC and had a clearly established, non-delegable constitutional duty not to be deliberately indifferent to the health and well-being of the inmates confined within VDOC facilities. At all times relevant to the subject matter of this litigation, Defendant Clarke was acting under color of state law in his capacity as Director of the VDOC.

27.  Defendants Robichaux, Jarvis, and Clarke are being sued for damages under Section 1983 in their individual capacities and under the ADA and Rehabilitation Act in their official capacities.

28.  The "Doe Defendants" in this matter are employees of Defendants whose identities are not presently known to Plaintiff but were active participants in the denial of Mr. Latson's constitutional rights and/or discrimination pursuant to the ADA and Rehabilitation Act. The identities of these Defendants will be pursued in discovery, and these Defendants may be added in their individual and official capacities, as appropriate.

## STATEMENT OF FACTS AND NATURE OF THE CASE

29.     On the morning of May 24, 2010, when Mr. Latson was 18 years old and living with his mother in Stafford, Virginia, he decided to go to a public library in Stafford County to wait for it to open, as he did many days. The library was a place of refuge for Mr. Latson, because it was a place where he could meet and interact with other teenagers.

30.     On that day in May 2010, Mr. Latson was involved in a confrontation with a law enforcement officer that began a cycle of crisis, escalation, and punishment from which he has only recently escaped.

31.     With limited exceptions, from May 24, 2010 until shortly after he was pardoned by Governor McAuliffe on January 20, 2015, Mr. Latson was confined in Virginia institutions under a variety of harsh and inhumane conditions, which would have been unsuitable for an individual without developmental disabilities, let alone someone with ASD and ID. *See A Pardon Can Begin Treatment*, The Virginian-Pilot, Jan. 22, 2015, attached hereto as Exhibit 1. Throughout this time, Mr. Latson's ASD and intellectual impairments were well known to Defendants, yet Defendants failed to make appropriate accommodations for Mr. Latson.

32.     The impact on Mr. Latson has been devastating, which was entirely predictable given his disabilities. Mr. Latson suffered a complete psychological breakdown after being confined in solitary for long stretches, exacerbating his already significant disabilities and resulting in long-term developmental and psychological damage.

33.     Mr. Latson brings the following claims to seek recovery based on the illegal and unconstitutional conditions of his confinement from April 21, 2014 through his release from incarceration on February 2, 2015.

## I.    RELEVANT FACTUAL BACKGROUND TO MR. LATSON'S CONFINEMENT[1]

### A.    EARLY LIFE

34.    Plaintiff Reginald Latson was born in Fort Lauderdale, Florida and moved to Stafford, Virginia in middle school.

35.    When he was in kindergarten, Mr. Latson was diagnosed as disabled and began receiving special education services when he was five years old. He repeated kindergarten due to his impairments.

36.    At seven years of age, Mr. Latson was assigned a full-scale IQ score of 61 and was noted as having delays in receptive grammar and reduced eye contact.

37.    Mr. Latson was first diagnosed and treated for ASD at 14 years of age. He exhibited "Asperger-like" symptoms, such as rocking, obsessive focusing and atypical behaviors, and was placed in special education throughout his adolescence. His school records from that time list him as having a "primary disability" of "autism," which caused Mr. Latson to have difficulties with communication, social interaction, and maintaining attention.

38.    Teachers, coaches, counselors, and family friends all describe Mr. Latson as sweet, kind, and eager to please. It is not uncommon, however, for people with autism to have unusual sensitivities and difficulty with regulating their responses. Mr. Latson's disabilities led to a handful of incidents at home and in his neighborhood throughout his adolescence that in several cases resulted in police intervention. These incidents, however, were addressed for what they were: mental health issues, not criminal violations.

---

[1]    Although Mr. Latson is not presently pursuing claims based on the facts comprising Section I, these events are important to understand the nature of Mr. Latson's entry into the Virginia criminal justice system and fully explain the inappropriateness of his ensuing placement.

**B.    STAFFORD COUNTY LIBRARY INCIDENT ON MAY 24, 2010**

39.    On the morning of May 24, 2010, when Mr. Latson was 18 years of age, he was outside a public library in Stafford County, waiting for it to open.

40.    While Mr. Latson was waiting, an unknown individual reported a suspicious person in the vicinity of the library, a black male in a hooded sweatshirt, "possibly carrying a gun." Stafford County Deputy Thomas Calverley responded to the call.

41.    When the deputy arrived on the scene, he saw Mr. Latson emerge from the woods abutting the library. Deputy Calverley approached Mr. Latson and, without warning, grabbed Mr. Latson's clothing, and patted down his person.

42.    Deputy Calverley quickly ascertained that Mr. Latson was not carrying a weapon, and it is undisputed that Mr. Latson had committed no crime and was never armed. After determining that Mr. Latson was unarmed, Deputy Calverley began questioning Mr. Latson. Mr. Latson did not answer Deputy Calverley's questions, however, and turned to walk away. In response, Deputy Calverley grabbed Mr. Latson by the arm and turned him back around.

43.    Individuals with ASD have difficulty understanding the actions and motivations of others, lack the ability to read social cues, struggle with complex language, do not readily understand the rules of social behaviors that are grasped intuitively by others, and often respond to unexpected situations with a high level of anxiety and agitation. Mr. Latson, feeling threatened, panicked, and confused, responded to the deputy's use of force with a fight-or-flight response, which is a common response for individuals with ASD who are faced with these types of situations.

44.    Mr. Latson again turned and tried to walk away, and Deputy Calverley attempted to arrest Mr. Latson for failing to identify himself, grabbing Mr. Latson from behind by both arms. Mr. Latson then tried to move away more forcefully, and Deputy Calverley pushed him

10

onto his police car and grabbed him by both arms in an attempt to restrain him. Deputy Calverley was injured in the course of this altercation.

## C.   CONVICTION AND INCARCERATION FOR STAFFORD COUNTY LIBRARY INCIDENT

45.     Mr. Latson was arrested, charged and convicted for assaulting Deputy Calverley, and he was sentenced to two years in prison, with credit for time served, followed by transfer to a residential treatment program.

46.     A sentencing memorandum submitted at that time contained an evaluation by Lance D. Clawson, a board-certified psychiatrist, concluding that "further incarceration will almost certainly be damaging to Mr. Latson's mental functioning and exacerbate his behavioral problems." It also opined that, "[a]t a minimum, further incarceration will rob [Mr. Latson] of a crucial learning period that needs to take place in order for him to have the possibility of a successful transition to adult life."

47.     Mr. Latson served a portion of this sentence in the Rappahannock Jail and he was transferred to a mental health unit at the Greensville Correctional Center in Jarratt, Virginia on or around June 8, 2011. Mr. Latson was thereafter moved from the Greensville facility to the Powhatan County Correctional Center, where he stayed until approximately February 13, 2012.

48.     Then, on or around February 13, 2012, having completed the prison term or "active" portion of his sentence for the Stafford County library incident, Mr. Latson was released on probation conditioned upon his enrollment in a residential treatment program in Winchester, Virginia operated by the Grafton Integrated Health Network (the "Grafton School"), a private non-profit mental health care provider.

## D.    GRAFTON SCHOOL INCIDENT

49.    On or around August 15, 2013, while Mr. Latson was on probation at the Grafton School in Winchester, Virginia undergoing treatment for ASD and his other disabilities, he suffered a significant mental health crisis, becoming visibly upset, threatening to hurt himself, and walking around in the yard and yelling.

50.    Staff at the Grafton School who usually worked with Mr. Latson were not present, and the employees who were working that day were apparently unfamiliar with the protocol staff typically followed if Mr. Latson became upset.  Instead of treating Mr. Latson's behavior with the usual de-escalation strategies, they called the police.

51.    Upon seeing the police arrive, Mr. Latson's condition further deteriorated, and he began to panic, asking the police officer to kill him, and even attempting to get the officer's gun to kill himself, causing a brief scuffle.  The officer was not injured.

## E.    FREDERICK COUNTY CHARGES STEMMING FROM GRAFTON SCHOOL INCIDENT

52.    Following the incident with the Winchester police officer, Mr. Latson was hospitalized for approximately two weeks and then was jailed at the Northwestern Regional Adult Detention Center in Winchester, Virginia while awaiting trial in Frederick County on the charges of assault and battery of a law enforcement officer and attempt to disarm a law enforcement officer as a result of the Grafton School incident.  A notice of probation violation, alleging that he had violated his Stafford County probation, was also lodged against Mr. Latson for the same incident.

53.    While at Northwestern Regional Adult Detention Center, Mr. Latson was placed in solitary confinement in a special unit.  This was not because he was a behavior problem, but

because he was considered vulnerable and in need of protection. Mr. Latson was not allowed to be out of his cell if any other prisoner was out.

54. As a result of the Grafton School incident, and despite Mr. Latson's mental health crisis and ensuing conduct being a symptom of his disability, which was exacerbated by the Commonwealth's failings, he ultimately pled guilty to the charges in Frederick County.

55. A sentencing memorandum submitted in the Frederick County case included an evaluation by Gonzalo Laje, a board-certified psychiatrist, again strongly recommending against further incarceration, concluding that "[f]urther incarceration will almost certainly be detrimental to Latson and to his ultimate re-integration to society." It also contained the evaluation by Dr. Clawson likewise concluding that "further incarceration will almost certainly be damaging to Mr. Latson's mental functioning and exacerbate his behavioral problems."

56. Despite these clear warnings, Mr. Latson was sentenced to ten years for the Grafton School incident (five years for assault and battery and five years for attempt to disarm a law enforcement officer, to be served consecutively), with a nine month active portion and the remainder suspended.

## F. STAFFORD COUNTY REVOKES PROBATION DUE TO GRAFTON SCHOOL INCIDENT, REINSTATING TIME FROM 2010 STAFFORD COUNTY LIBRARY INCIDENT

57. After his guilty plea and sentence in Frederick County, Mr. Latson went to court in Stafford County to address the charge that the Grafton School incident violated Mr. Latson's probation imposed following the Stafford County library incident. Although the events at Grafton were clearly the result of a mental health crisis, the Commonwealth chose to treat them as a run-of-the-mill criminal matter, and strenuously opposed Mr. Latson's request that the Circuit Court of Stafford County approve his placement at AdvoServ, a Florida residential treatment center (where Mr. Latson currently resides).

13

58.     The Commonwealth Attorney for Stafford County, Eric Olsen, insisted that the court simply revoke Mr. Latson's probation—and thus retrigger the deleterious cycle of mental health crisis, confrontation, arrest, and incarceration—resulting in even further mental and emotional damage to Mr. Latson.

59.     Prosecutor Olsen explained the Commonwealth's rationale for pursuing the probation violation against Mr. Latson, asserting that: "I think the mental retardation is an aspect of convenience."

60.     This flippant statement was symptomatic of the Commonwealth's and the other Defendants' attitude toward accommodating Mr. Latson's serious medical and mental health needs within their facilities.

61.     On March 20, 2014, the Stafford County Circuit Court imposed an additional sentence of one year in jail but recommended that rather than serving the time in Stafford County's Rappahannock Regional Jail, which would be the expected outcome, Mr. Latson remain in the Northwestern Regional Adult Detention Center in Winchester, where he had been coping relatively well.

## II. MR. LATSON'S INCARCERATION, SOLITARY CONFINEMENT, AND MISTREATMENT AT RAPPAHANNOCK JAIL FROM APRIL 21, 2014 TO JUNE 5, 2014

62.     On or around April 21, 2014, Mr. Latson was abruptly transferred from the Northwestern Regional Adult Detention Center in Winchester to the Rappahannock Jail in Stafford County, Virginia, despite the Stafford County Circuit Court's recommendation that Mr. Latson remain in the Northwestern Regional Adult Detention Center.

63.     Upon his arrival at Rappahannock Jail, immediately after intake, Mr. Latson was placed in solitary confinement.  He was not allowed telephone calls during this period, nor did Rappahannock Jail even attempt to reasonably address Mr. Latson's well-known mental health

14

needs. The one pane of glass on his windowless cell was deliberately covered so that he could not see into the hallway, and he was given no television, radio, or reading material except a dictionary.

64.    Only three days after his arrival, Mr. Latson, in obvious psychological distress, was evaluated by a psychiatrist who concluded he was suicidal, prescribed antipsychotic medication, and ordered Mr. Latson moved to a crisis cell for full suicide watch.

65.    On April 24, 2014, while a corrections officer (who took no special care or precautions to accommodate Mr. Latson's disabilities) was placing Mr. Latson in the crisis cell for suicide watch, he ordered Mr. Latson to put his hands on the wall, and then physically pushed him against the wall.

66.    Mr. Latson, once more in the midst of a diagnosed mental health crisis, reacted to this physical force with a fight-or-flight response common to his disability, and lashed out, striking the officer.

67.    Mr. Latson, then surrounded by three correctional officers, was tasered by First Sergeant William Diehl, who allowed the Taser to run the full five-second cycle, causing Mr. Latson to collapse to the floor after neuromuscular incapacitation was achieved. Under the direction of First Sergeant Diehl, Mr. Latson was then placed in handcuffs and leg irons and seen by a nurse who removed the probes.

68.    Following that incident, and despite the fact that any perceived need for the application of force had since disappeared, a Pro-Straint chair was brought to Mr. Latson's crisis cell, where he had already been placed for his own safety, and four correctional officers at the direction of First Sergeant Diehl strapped Mr. Latson to the chair. A Pro-Straint chair is a large

15

chair with a straight back and straps used to fully restrain an inmate's legs, arms, waist, and chest.

69.    While in the Pro-Straint chair, officers checked on Mr. Latson every fifteen minutes, and all checks performed within the first hour-and-a-half observed him as either "quiet" or "responsive."  For the following four-and-a-half hours, all checks observed him only as "quiet."  Nevertheless, records document that Mr. Latson was left in the Pro-Straint chair, unable to move, for a period of over nine hours.

70.    The incident precipitating Mr. Latson's placement in the Pro-Straint chair began shortly after 11:00 am.  Mr. Latson was not released from the Pro-Straint chair until close to 9:00 pm.  At that time, he was given only a snack bag and a milk, as Mr. Latson had been given no dinner.  For the preceding nine hours, Mr. Latson was also not provided an opportunity out of the Pro-Straint chair to use the restroom or to eat.

71.    Following the incident with the Taser and Pro-Straint chair, Mr. Latson was placed in a "crisis cell" on modified suicide watch for a week.  This cell was a bare room devoid of even basic accommodations, lacking a bed (only a "safety mattress" was provided), toilet, or any other furnishings or toiletries.

72.    On or around May 1, 2014, within one week of the incident, Mr. Latson was transferred to solitary confinement, referred to as "administrative segregation" by Rappahannock Jail.

73.    While in administrative segregation, the jail's mental health staff conducted only minimal checks (*i.e.*, suicide watch checks to verify that Mr. Latson was not in immediate physical danger), and prison staff (identities presently unknown) prevented Mr. Latson from receiving the actual mental health testing or treatment he desperately required.

16

74.    Mr. Latson remained in solitary confinement for over a month until he was transferred to Marion CTC on or around June 5, 2014.

75.    It is well known that the placement of prisoners with mental illness in solitary confinement, especially those with intellectual disabilities, exacerbates mental illness.

76.    In fact, the effects of solitary confinement on inmates *without any* disabilities are well documented. Time and time again, research has demonstrated the staggering toll isolation takes on people subjected to it. Specifically, the impacts of solitary confinement can be similar to those of physical torture and include a variety of negative physiological and psychological reactions.

77.    Given this, it is entirely predictable that placing disabled prisoners, such as Mr. Latson, into isolation severely exacerbates their conditions. As researchers have concluded, solitary confinement is psychologically difficult for even relatively healthy individuals, but it is devastating for those with mental illness.

78.    In fact, at all times relevant to this complaint, the Rappahannock Defendants knew, or should have known, about the deleterious effects of solitary confinement on mental health. A 2003 report issued to the Rappahannock Regional Jail Authority by Lindsay M. Hayes, a suicide consultant provided by the National Institute of Corrections to assist Rappahannock Jail with reviewing its suicide practices following a series of inmate suicides at the jail (the "Suicide Report"), stated that "[i]solation should be avoided. Whenever possible, suicidal inmates should be housed in general population, mental health unit, or medical infirmary, located in close proximity to staff." Nevertheless, Rappahannock Jail staff confined Mr. Latson in conditions of severe isolation.

17

79.     The Suicide Report also stated that the "use of medical restraints (e.g., straitjackets, leather straps, restraint chair or boards, etc.) should be avoided whenever possible, and only utilized as a last resort for periods in which the inmate is physically engaging in self-destructive behavior." Nevertheless, despite the fact that officers were aware that Mr. Latson had been placed on full suicide watch, Rappahannock Jail staff left Mr. Latson in a Pro-Straint chair for over nine hours.

80.     The conditions of Mr. Latson's stay in solitary confinement were inhumane and inexcusable. His so-called "crisis cell" contained no sink and no toilet, but only a grate on the floor.

81.     The Rappahannock Defendants were aware that these conditions were unacceptable, as United States Immigration and Customs Enforcement ("ICE") conducted a compliance inspection of Rappahannock Jail in 2012 and recommended at that time that policies and procedures be adopted requiring removal of ICE detainees to use toilet facilities, when necessary, in order "[t]o protect the privacy and dignity of detainees placed in [Rappahannock Jail's] crisis cells." The same rationale was applicable to non-ICE detainees.

82.     Even after he was moved from the crisis cell to regular "segregation," Mr. Latson was provided no sensory stimulation of any kind, as his cell had no window and he was provided with no radio, reading materials, access to a television, or way to keep track of time. All Mr. Latson could see while in solitary confinement were the walls of his cell and the solid steel door. For the more than a month that Mr. Latson was in solitary confinement, he was allowed out of his cell only during the time that it took for it to be cleaned and then he was quickly returned.

83.     While in segregation, Mr. Latson's condition continued to deteriorate, and, as a result, he refused to take his medicine on at least one occasion (resulting in additional discipline).

84.    In addition to being aware of Mr. Latson's mental health condition due to extensive correctional and medical records, staff members at the Rappahannock Jail, including Defendants Grimes and Higgs, also were contacted multiple times by representatives of the Rappahannock Community Services Board as well as advocates for Mr. Latson, who raised concerns that this treatment was worsening his mental and physical condition.

85.    These staff largely ignored the documentation and pleas from Mr. Latson's advocates, keeping him isolated in administrative segregation and denying him even the most basic of items and stimulation.

86.    On information and belief, at all relevant times, agents and employees of Rappahannock Jail and Rappahannock Regional Jail Authority were acting pursuant to official policy and/or custom, including those governing the use of Tasers, physical restraints, placement in crisis cells, and solitary confinement.

## III.    PROSECUTION FOR THE RAPPAHANNOCK JAIL INCIDENT

87.    Although the officer at the Rappahannock Jail was not seriously injured and returned to duty, and despite what was known about Mr. Latson's mental state at the time, Mr. Latson was criminally charged yet again with assault relating to that incident as described in paragraphs 65-70 above—perpetuating the cycle of emotional disturbance and punitive reaction by the Commonwealth.

88.    Commonwealth Attorney Eric Olsen again brought felony charges against Mr. Latson, despite the fact that the incident—and the underlying mental health crisis sparking the incident—was entirely predictable, preventable, and provoked.

89.    Nationally-known corrections expert Eldon Vail reviewed the handling of Mr. Latson's April 2014 offense, commenting that the treatment of this mental health crisis as a criminal matter was inappropriate and inconsistent with the standard practice of other jails and

prisons nationwide. Mr. Vail explained that such treatment for mentally ill inmates like Mr. Latson will "often end up in a downward cycle of rule violation, punishment, segregation placement, which exacerbates their condition and leads to more rule violations, more punishment and longer or permanent stays in solitary confinement."

90. Nevertheless, as with Defendants' handling of prior mental health crises, Mr. Latson was again criminally charged and ultimately pled guilty to the charge of assault on a police officer, receiving an additional six month sentence.

## IV. FURTHER INCARCERATION, SOLITARY CONFINEMENT, AND MISTREATMENT AT MARION CORRECTIONAL TREATMENT CENTER FROM JUNE 5, 2014 TO FEBRUARY 2, 2015

### A. TRANSFER TO, AND INITIAL INCARCERATION AT, MARION CORRECTIONAL TREATMENT CENTER

91. In June 2014, after Mr. Latson's advocates pleaded for him to be moved from the Rappahannock Jail to a facility where he would be treated humanely and where his disabilities would be understood and accommodated, Mr. Latson was moved to VDOC's Marion Correctional Treatment Center. His situation there, however, was no better. At Marion, Mr. Latson was housed in similarly isolating conditions that are even more appalling because Marion CTC is a state facility specifically designated to house offenders with mental illness.

92. At Marion CTC, as in Rappahannock Jail, the Commonwealth Defendants made no accommodations for Mr. Latson's extensive and well-documented history of mental disability.

93. Mr. Latson was kept once more in isolation, and was refused needed stimulus in his cell, such as a television, radio, or reading materials. The only access to these items was when Mr. Latson was out of his cell, which only occurred one hour per day, five days per week.

20

The remaining two days per week, Mr. Latson was not allowed any time out of his cell, and therefore no access to stimulus of any kind.

94. For much of this period, which lasted almost six months, Mr. Latson spent his days staring at the wall in complete isolation and with nothing to distract him or to help him pass the time.

95. Mr. Latson's "canteen" at Marion CTC was also restricted to writing materials and hygiene supplies; he was not permitted to order snacks or any other discretionary items. Together, these restrictive and inhumane conditions led to serious psychological and physiological harms for Mr. Latson.

96. At Marion CTC, the Commonwealth Defendants made no attempt to fashion a protocol to address Mr. Latson's mental health needs. Instead, as with its prior failings, it treated the symptoms of Mr. Latson's disabilities and related behavioral incidents as criminal violations, responding to them punitively rather than medically.

97. For example, on or around July 11, 2014, Mr. Latson was given twenty days of "punitive segregation" allegedly for throwing his coffee cup at the wall and pushing his breakfast tray through the slot in his cell door, striking the officer on the other side in the abdomen. As a result of this incident—which, again, should be entirely foreseeable for an individual with ASD and other developmental disabilities—Mr. Latson was physically extracted from his cell, resulting in a laceration to his arm that required stitches. During the ensuing twenty-day punitive segregation period, Mr. Latson was deprived of out-of-cell time entirely—thus, he remained in his cell, by himself, with no stimulation, for 20 days straight.

**B.    NEGATIVE    PUBLICITY    AND    TRANSFER    TO    GENERAL
POPULATION**

98.    In late 2014, while Mr. Latson was incarcerated at Marion CTC, Mr. Latson's
mistreatment began to receive media attention.

99.    In addition, the U.S. Department of Justice interviewed Mr. Latson as part of its
fact-finding regarding the Commonwealth of Virginia's compliance with an August 2012
Settlement Agreement requiring compliance with the ADA for individuals with intellectual and
developmental disabilities.

100.    Virginia's federally-mandated Protection and Advocacy Organization also
interviewed Mr. Latson and sought information about his custody.

101.    Following this negative publicity, in December 2014, Mr. Latson was transferred
from administrative segregation to the general population at Marion CTC.

**C.    MR. LATSON RECEIVES CONDITIONAL PARDON**

102.    On January 12, 2015, counsel working on Mr. Latson's behalf submitted a formal
pardon request to Virginia Governor Terry McAuliffe.

103.    Governor McAuliffe granted Mr. Latson a conditional pardon on January 20,
2015, approving Mr. Latson's transfer to AdvoServ, as first discussed with the Virginia
Department of Behavioral Health & Developmental Services ("DBHDS") and Department of
Medical Assistance Services ("DMAS") as early as August 2013, and for which the Virginia
DMAS had procured funding back in October 2013.

**D.    TRANSFER TO SOLITARY CONFINEMENT *AFTER* PARDON IS
GRANTED**

104.    On or about January 23, 2015, three days *after* Mr. Latson was pardoned by
Governor McAuliffe, he was inexplicably returned to solitary confinement at Marion CTC.

While in solitary confinement, Mr. Latson was stripped of his possessions and again did not have access to books, music, television, or the prison canteen.

105.    Upon information and belief, Mr. Latson was placed in solitary confinement after his pardon as an act of retaliation by guards and staff at Marion CTC (identities presently unknown) in response to Mr. Latson's exercise of his First Amendment right to free speech through his communications with his family and attorneys and his successful pardon application to Governor McAuliffe.

106.    As a result of the retaliatory action by the Marion CTC guards and staff, Mr. Latson's ability to communicate with his attorneys, family, and others outside of the facility was restricted.    Further, this retaliatory action caused Mr. Latson to fear further retaliation if he subsequently were to exercise his speech rights.

### E.    PLACEMENT AT ADVOSERV AND PRESENT CONDITION

107.    Mr. Latson was transferred to AdvoServ on February 2, 2015.

108.    Although AdvoServ is more capable of meeting Mr. Latson's mental health needs, Mr. Latson has experienced significant and potentially irreversible trauma and other damage as a result of his incarceration, isolation, and non-accommodation at the hands of the defendants.

### V.    THE LASTING EFFECTS OF MR. LATSON'S IMPRISONMENT AND ISOLATION

109.    In addition to the research discussed above regarding the devastating impact of solitary confinement on the mentally ill, in recent months, Supreme Court Justice Anthony Kennedy, in both Congressional testimony and in a written Supreme Court concurring opinion, condemned the use of solitary confinement for prisoners.    As Justice Kennedy succinctly stated to a House of Representatives subcommittee, "solitary confinement literally drives men mad."

110.    Further, in recognition of the detrimental effects of solitary confinement, President Obama recently issued an executive order prohibiting the use of solitary confinement on inmates under eighteen years old in federal prisons.

111.    According to a recent Human Rights Watch Report, "the harsh conditions of being held alone in a cell 23 hours or more a day with little or nothing to do, coupled with the paucity of mental health treatment characteristic of such units, can lead to an increase in symptoms."

112.    Unfortunately, yet unsurprisingly, Mr. Latson's treatment is a textbook illustration of why solitary confinement is a fundamentally inappropriate placement for an individual with ASD and ID.

113.    As a result of the conditions under which Mr. Latson was kept at the hands of Defendants, and due to Defendants' failure to treat his other serious medical needs, Mr. Latson developed a number of mood, anxiety, and panic disorders, including posttraumatic stress disorder ("PTSD").

114.    After his release from prison in early 2015, Mr. Latson has shown significant difficulty adapting to his new environment.  His mental and emotional development has been utterly derailed, and he experiences severe anxiety and fear in the presence of authority figures. Whereas Mr. Latson once showed promise of leading a relatively independent life (*i.e.*, one with the least restrictive placement and some type of occupation or other unsupervised daily tasks), there is now no reasonable likelihood of him gaining back that level of independence – at least not in the foreseeable future.  Given the severity of his trauma symptoms, Mr. Latson will need to depend on others to help manage his heightened fear and reactivity in stressful or intense interpersonal situations and anxious hypervigilance to signs of danger. Additionally, he will

24

continue to need long-term mental health support to combat overwhelming feelings of anxiety, depression, social isolation, and hopelessness.

115. This trauma is a direct result of his mistreatment while incarcerated at the hands of Defendants, including extensive solitary confinement and other actions as described above.

## CLAIMS FOR RELIEF

## COUNT ONE

**Section 1983: Eighth Amendment (Conditions of Confinement)**
*(as to Defendants Rappahannock Regional Jail, Rappahannock Regional Jail Authority, Higgs (individual capacity), Grimes (individual capacity), Robichaux (individual capacity), Jarvis (individual capacity), and Clarke (individual capacity))*

116. The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

117. At all times relevant to the allegations in this Complaint, these Defendants acted or failed to act under color of state law.

118. These Defendants are persons under 42 U.S.C. § 1983.

119. Plaintiff Latson enjoys an Eighth Amendment right to be free from cruel and unusual punishment, a right which is enforced against the states through the Fourteenth Amendment.

120. That Eighth Amendment right includes the right to be free from extreme deprivation of minimal civilized necessities.

121. As described above, these Defendants subjected Mr. Latson to conditions creating an extreme deprivation of minimal civilized necessities, such as a bed, toilet, medical care, and the basic human interaction medically and therapeutically necessary for an individual with ASD.

122. In particular, these Defendants punitively subjected Mr. Latson to harsh and inhumane conditions, such as prolonged periods of solitary confinement, denial of basic social

25

interaction, bodily harm, neglect, and abuse, as a direct response to conduct that was a manifestation of Mr. Latson's disabilities. In turn, these harmful conditions exacerbated these same disabilities and caused irreparable harm to Mr. Latson.

123. Moreover, these Defendants, themselves and, upon information and belief, through their direction of subordinates, denied Mr. Latson the necessary medical and psychological care required to treat an individual suffering from ASD and the various other disabilities with which Mr. Latson has been diagnosed.

124. These Defendants engaged in this injurious conduct with deliberate indifference to Mr. Latson's health and safety, in light of his extensive and detailed record of mental health diagnoses, placing Mr. Latson in substantial risk of serious harm.

125. At numerous times throughout the course of his incarceration, Defendants were informed by Mr. Latson's family and advocates that the conditions of his confinement were extreme and causing Mr. Latson permanent harm; accordingly, these Defendants also had actual or constructive knowledge that Mr. Latson's constitutional rights were being violated.

126. The acts or omissions of these Defendants were conducted within the scope of their official duties and employment.

127. The acts or omissions of these Defendants were the legal and proximate cause of Mr. Latson's injuries and pain.

128. The acts or omissions of Defendants Rappahannock Regional Jail and Rappahannock Regional Jail Authority were made pursuant to an official policy or custom of these Rappahannock Defendants.

129.    The acts or omissions of Defendants as described above intentionally deprived Mr. Latson of his right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the Constitution.

130.    Due to these Defendants' deliberate indifference to a serious risk of harm to Mr. Latson, they have denied him his Eighth Amendment rights, as enforced through the Fourteenth Amendment, in violation of 42 U.S.C. § 1983.

## COUNT TWO

**Section 1983:  Eighth Amendment (Failure to Provide Medical Care)**
*(as to Defendants Rappahannock Regional Jail, Rappahannock Regional Jail Authority, Higgs (individual capacity), Grimes (individual capacity), Robichaux (individual capacity), Jarvis (individual capacity), and Clarke (individual capacity))*

131.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

132.    At all times relevant to the allegations in this Complaint, these Defendants acted or failed to act under color of state law.

133.    These Defendants are persons under 42 U.S.C. § 1983.

134.    Plaintiff Latson enjoys an Eighth Amendment right to be free from cruel and unusual punishment, a right which is enforced against the states through the Fourteenth Amendment.

135.    That Eighth Amendment right includes the right to receive treatment for his serious medical needs.

136.    As described above, these Defendants, themselves and, upon information and belief, through their direction of subordinates, failed to provide necessary medical treatment for Mr. Latson's known and well-documented disabilities and medical conditions.

137. In particular, these Defendants themselves and, upon information and belief, through their direction of subordinates, denied Mr. Latson the necessary medical and psychological care required to treat an individual suffering from ASD and the various other disabilities with which Mr. Latson has been diagnosed.

138. These Defendants engaged in this injurious conduct with deliberate indifference to Mr. Latson's serious medical needs, in light of his extensive and detailed record of mental health diagnoses, placing Mr. Latson in substantial risk of serious harm.

139. At numerous times throughout the course of his incarceration, Defendants were informed by Mr. Latson's family and advocates that his serious medical needs were not being met; accordingly, these Defendants also had actual or constructive knowledge that Mr. Latson's constitutional rights were being violated.

140. The acts or omissions of these Defendants were conducted within the scope of their official duties and employment.

141. The acts or omissions of these Defendants were the legal and proximate cause of Mr. Latson's injuries and pain.

142. The acts or omissions of Defendants Rappahannock Regional Jail and Rappahannock Regional Jail Authority were made pursuant to an official policy or custom of these Rappahannock Defendants.

143. The acts or omissions of Defendants as described above intentionally deprived Mr. Latson of his right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the Constitution.

144.    Due to these Defendants' deliberate indifference to Mr. Latson's serious medical needs, they have denied him his Eighth Amendment rights, as enforced through the Fourteenth Amendment, in violation of 42 U.S.C. § 1983.

## COUNT THREE

**Section 1983:  Eighth Amendment (Excessive Use of Force)**
*(as to Defendants Rappahannock Regional Jail, Rappahannock Regional Jail Authority, Higgs (individual capacity), Grimes (individual capacity), and Diehl (individual capacity))*

145.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

146.    At all times relevant to the allegations in this Complaint, these Defendants acted or failed to act under color of state law.

147.    These Defendants are persons under 42 U.S.C. § 1983.

148.    Plaintiff Latson enjoys an Eighth Amendment right to be free from cruel and unusual punishment, a right which is enforced against the states through the Fourteenth Amendment.

149.    That Eighth Amendment right includes the right to be from excessive use of force.

150.    As described above, these Defendants, themselves and, upon information and belief, through their direction of subordinates, subjected Mr. Latson to excessive force when he was tasered and then restrained in a Pro-Straint chair for over nine hours.

151.    The Defendants, themselves and, upon information and belief, through their direction of subordinates, caused the Taser to run the full five-second cycle, achieving neuromuscular incapacitation and causing Mr. Latson to collapse to the floor in a manner that was excessive.

152.    In addition, any perceived need for the application of force had dissipated at the moment neuromuscular incapacitation was achieved and Mr. Latson was then placed in

handcuffs and leg irons. Nevertheless, Defendants, themselves and, upon information and belief, through their direction of subordinates, then placed Mr. Latson in a Pro-Straint chair for a period of over nine hours.

153. These Defendants engaged in this injurious conduct with wantonness by applying force maliciously and sadistically for the very purpose of causing harm, rather than in a good-faith effort to maintain or restore discipline, particularly in light of Mr. Latson's extensive and detailed record of mental health diagnoses.

154. The acts or omissions of these Defendants were conducted within the scope of their official duties and employment.

155. The acts or omissions of these Defendants were the legal and proximate cause of Mr. Latson's injuries and pain.

156. The acts or omissions of Defendants Rappahannock Regional Jail and Rappahannock Regional Jail Authority were made pursuant to an official policy or custom of these Rappahannock Defendants.

157. The acts or omissions of Defendants as described above intentionally deprived Mr. Latson of his right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the Constitution.

158. Due to these Defendants' deliberate indifference to Mr. Latson's serious medical needs, they have denied him his Eighth Amendment rights, as enforced through the Fourteenth Amendment, in violation of 42 U.S.C. § 1983.

## COUNT FOUR

### Section 1983: Fourteenth Amendment
*(as to Defendants Rappahannock Regional Jail, Rappahannock Regional Jail Authority,*
*Higgs (individual capacity), Grimes (individual capacity),*
*Robichaux (individual capacity), Jarvis (individual capacity), and Clarke (individual capacity))*

159.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

160.    Plaintiff Latson enjoys a Fourteenth Amendment right to due process under the laws, including the right to be free from unnecessary or inappropriate medication and medical treatment administered by the government, as well as the right to a minimum level of appropriate medical treatment for his well-documented disabilities.

161.    Plaintiff Latson, as an inmate with ASD and developmental disabilities, was erratically administered antipsychotics and was denied necessary treatment for his ASD and ID at various points, including while awaiting trial.

162.    These Defendants engaged in this injurious conduct with deliberate indifference to Mr. Latson's health, safety and corporeal integrity, in light of his extensive and detailed record of mental health diagnoses, placing Mr. Latson in substantial risk of serious harm.

163.    At numerous times throughout the course of his incarceration, Defendants were informed by Mr. Latson's family and advocates that his serious medical needs were not being met; accordingly, these Defendants also had actual or constructive knowledge that Mr. Latson's constitutional rights were at risk.

164.    The acts or omissions of Defendants Rappahannock Regional Jail and Rappahannock Regional Jail Authority were made pursuant to an official policy or custom of these Rappahannock Defendants.

31

165.   There is no legitimate penological interest or rational basis for failing to provide even the most basic assistance or accommodation in jail or prison facilities to individuals such as Mr. Latson, who have ASD and developmental disabilities.

166.   Due to these Defendants' arbitrary and irrational discrimination against Mr. Latson on the basis of his disabilities, they have denied him his right to equal protection guaranteed by the Fourteenth Amendment, in violation of 42 U.S.C. § 1983.

## COUNT FIVE

### Section 1983:  First Amendment
*(as to Defendants Robichaux (individual capacity), Jarvis (individual capacity), and Clarke (individual capacity))*

167.   The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

168.   At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

169.   Defendants are persons under 42 U.S.C. § 1983.

170.   Plaintiff Latson enjoys a First Amendment right to speak without fear of government retaliation.

171.   Plaintiff Latson exercised constitutionally protected speech by communicating with his family and attorneys and by submitting a pardon application to Governor McAuliffe.

172.   As a result of this protected speech, Defendants Robichaux, Jarvis, and Clark retaliated against Mr. Latson by placing him back into solitary confinement—even after Governor McAuliffe granted him a conditional pardon.

173.   These Defendants engaged in this injurious conduct with deliberate indifference to Mr. Latson's First Amendment rights, and with actual or constructive knowledge that these

rights were being placed at risk by Mr. Latson's punitive placement back into solitary confinement after seeking a pardon.

174. This retaliation interfered with Mr. Latson's First Amendment rights both because of the resulting restrictions on his ability to communicate with anyone outside of the Marion CTC and the fear it created of further retaliatory action.

## COUNT SIX

### Americans with Disabilities Act
*(as to Defendants Higgs (official capacity), Grimes (official capacity),
Rappahannock Regional Jail, Rappahannock Regional Jail Authority,
Robichaux (official capacity), Jarvis (official capacity), Marion Correctional Treatment Center,
Commonwealth of Virginia, Virginia Department of Corrections, and Clarke (official capacity))*

175. The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

176. Plaintiff Latson is an individual with a mental impairment, a record of such an impairment, and regarded as having such impairment within the meaning of 42 U.S.C. § 12102.

177. His serious mental illnesses, including ID and ASD, even when mitigated through medical treatment, constitute mental impairments that substantially limit him in several major life activities, including but not limited to learning, concentrating, thinking, and interacting with others. These limitations on his life activities have had a profound effect on Mr. Latson's life as fully described above.

178. Mr. Latson is a qualified individual with a disability as defined in 42 U.S.C. § 12102.

179. These Defendants are public entities as that term is used in 42 U.S.C. § 12131.

180. Mr. Latson is entitled to be free from discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

181.   These Defendants failed to accommodate Mr. Latson's mental disabilities and denied him the benefits and services of their facilities by reason of his mental disability by, *inter alia*, placing Mr. Latson in solitary confinement for extended periods of time, placing Mr. Latson in restraint chairs without justification for extended periods of time, denying Mr. Latson social interaction and other stimulus, and denying him reasonable standards of hygiene, all as a result of his mental disabilities.

182.   Mr. Latson's treatment and placement within Defendants' institutions was not appropriate in light of his disabilities, and Mr. Latson was placed in increasingly severe and punitive conditions in Defendants' institutions as a result of behavior that was a manifestation of his disabilities.

183.   These Defendants' discrimination was intentional and/or represents deliberate indifference to the strong likelihood that pursuit of the actions, and, to the extent applicable, adoption of the policies that led to these actions, at issue in this Complaint would likely result in a violation of federally protected rights.

184.   As a proximate and foreseeable result of these Defendants' discriminatory acts and omissions Plaintiff suffered injuries including pain and suffering, emotional distress, and an exacerbation of his mental illness.

## COUNT SEVEN

**Rehabilitation Act**
*(as to Defendants Higgs (official capacity), Grimes (official capacity),*
*Rappahannock Regional Jail, Rappahannock Regional Jail Authority,*
*Robichaux (official capacity), Jarvis (official capacity), Marion Correctional Treatment Center,*
*Commonwealth of Virginia, Virginia Department of Corrections, and Clarke (official capacity))*

185.   The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

34

186.    Plaintiff Latson is an individual with a mental impairment, a record of such an impairment, and is regarded as having such impairment within the meaning of 42 U.S.C. § 12102 (as incorporated into 29 U.S.C. § 705(b)(9)(B)).

187.    His serious mental illnesses including ID and ASD, even when mitigated through medical treatment, constitute mental impairments that substantially limit him in several major life activities, including but not limited to learning, concentrating, thinking, and interacting with others. These limitations on his life activities have had a profound effect on Mr. Latson's life as fully described above.

188.    Mr. Latson, with or without reasonable modifications to rules, policies or practices, met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants. Thus, Mr. Latson is an "otherwise qualified handicapped person" within the meaning of the Rehabilitation Act.

189.    These Defendants receive and benefit from federal financial assistance as that term is used in 29 U.S.C. § 794 through the Prison Rape Elimination Act and other sources.

190.    Mr. Latson is entitled to be free from discrimination under the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.

191.    These Defendants failed to accommodate Mr. Latson's mental disabilities and denied him the benefits and services of their facilities by reason of his mental disability by, *inter alia*, placing Mr. Latson in solitary confinement for extended periods of time, placing Mr. Latson in restraint chairs without justification for extended periods of time, denying Mr. Latson social interaction and other stimulus, and denying him reasonable standards of hygiene, all as a result of his mental disabilities.

192.    Mr. Latson's treatment and placement within Defendants' institutions was not appropriate in light of his disabilities, and Mr. Latson was placed in increasingly severe and punitive conditions in Defendants' institutions as a result of behavior that was a manifestation of his disabilities.

193.    These Defendants' discrimination was intentional and/or represents deliberate indifference to the strong likelihood that pursuit of the actions and policies at issue in this Complaint would likely result in a violation of federally protected rights.

194.    As a proximate and foreseeable result of these Defendants' discriminatory acts and omissions Plaintiff suffered injuries including pain and suffering, emotional distress and an exacerbation of his mental illness.

## PUNITIVE DAMAGES

*(as to Defendants Higgs (individual capacity), Grimes (individual capacity), Robichaux (individual capacity), Jarvis (individual capacity), and Clarke (individual capacity))*

195.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

196.    Mr. Latson is entitled to recover punitive damages related to these Defendants' willful or reckless disregard of the violations of his constitutional rights under the First, Eighth, and Fourteenth Amendments.

## JURY DEMAND

197.    Plaintiff hereby demands a trial by jury on all counts so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in his favor and against Defendants, and grant him the following relief:

1.    Compensatory damages in an as yet undetermined amount, jointly and severally against all Defendants, including damages for physical injuries and emotional harm.

2.    Punitive damages in an as yet undetermined amount against Defendants Higgs, Grimes, Robichaux, Jarvis, and Clarke (in their individual capacities).

3.    Reasonable costs and attorneys' fees incurred in bringing this action.

4.    Pre and post-judgment interest at the highest lawful rate.

5.    Such other and further relief as the Court deems just and proper.

Dated:  April 21, 2016

Respectfully submitted,

*Caitlin M. Kasmar*

BUCKLEYSANDLER LLP
Caitlin M. Kasmar (VSB No. 68298)
Katherine B. Katz (VSB No. 80171)
1250 24th Street NW, Suite 700
Washington, DC 20037
E-mail:        ckasmar@buckleysandler.com
               kkatz@buckleysandler.com
Telephone:     202-349-8000
Facsimile:     202-349-8080

Washington Lawyers' Committee
    for Civil Rights and Urban Affairs
Deborah Golden
Elliot M. Mincberg
11 Dupont Circle NW, Suite 400
Washington, DC 20036
Email:         deborah_golden@washlaw.org
               elliot_mincberg@washlaw.org
Telephone:     202-319-1000
Facsimile:     202-319-1010

*Counsel for Plaintiff Reginald Cornelius Latson*