# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **REGINALD CORNELIUS LATSON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16CV00039 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD W. CLARKE, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Caitlin Marie Kasmar and Katherine Katz, BuckleySandler LLP, Washington, D.C., and Deborah Golden and Elliot M. Mincberg, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Washington, D.C., for Plaintiff; Nancy Hull Davidson, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Defendants.*

In this civil rights case, the plaintiff, a Virginia inmate, asserts claims against prison officials and state entities based on the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as the Americans with Disabilities Act and the Rehabilitation Act. The defendants have moved to dismiss the Amended Complaint on numerous grounds. For the reasons that follow, I will grant in part and deny in part the Motion to Dismiss.

## I.

The Amended Complaint alleges the following facts, which I must accept as true for the purpose of deciding the pending motion.

The plaintiff, Reginald Cornelius Latson, is a twenty-four year old man who has been diagnosed with autism spectrum disorder ("ASD") and intellectual disability ("ID"). These conditions limit his major life activities of learning, concentrating, thinking, communicating, interacting with others, caring for himself, and working. He has a record of such impairments and is regarded by the defendants as having such impairments.

Marion Correctional Treatment Center ("MCTC") is a medium security state prison located in Marion, Virginia. Mr. Latson was confined at MCTC from June 5, 2004 until February 2, 2015. The Commonwealth of Virginia, through the Virginia Department of Corrections ("VDOC"), operates MCTC. MCTC and VDOC receive federal financial assistance.

Defendant Dara Robichaux served as Assistant Warden of MCTC while Latson was incarcerated. Robichaux supervised MCTC employees and had authority to establish and implement policies and procedures. Defendant Larry Jarvis was the Warden of MCTC during part of the time that Latson was incarcerated. He also supervised MCTC employees and had authority to establish and implement policies and procedures. Defendant Harold W. Clarke is the Director of VDOC. Clarke oversees VDOC employees and has authority to establish, alter, and implement VDOC policies and procedures. Latson has also

sued certain "Doe Defendants," who are employees of the defendants whose identities are presently unknown to Latson.

Latson was diagnosed as disabled and began receiving special education services in kindergarten. He repeated kindergarten due to his impairments. At the age of seven, Latson was assigned a full-scale IQ score of sixty-one and was noted as having delays in receptive grammar and reduced eye contact. He was diagnosed with ASD at age fourteen. He exhibited symptoms such as rocking, obsessive focusing, and atypical behaviors and was placed in special education throughout his adolescence. His ASD caused him to have difficulty with communication, social interaction, and maintaining attention.

It is not uncommon for people with ASD to have unusual sensitivities and difficulty regulating their responses. People with ASD have trouble understanding the actions and motivations of others, lack the ability to read social cues, struggle with complex language, do not easily understand rules of social behavior, and often respond to unexpected situations with anxiety and agitation.

On April 21, 2014, Latson was transferred from the Northwestern Regional Adult Detention Center to the Rappahannock Regional Jail ("Rappahannock").[1]

---

[1] The Amended Complaint sets forth detailed allegations regarding incidents that happened before Latson was confined at Rappahannock or MCTC. I do not recount most of those allegations here because they are not relevant to the claims asserted against the defendants in this case or the issues raised in the Motion to Dismiss.

When he arrived at Rappahannock, he was placed in solitary confinement. He was not permitted to make telephone calls; a window between his cell and the hallway was covered so he could not see into the hallway; and he was given no material for entertainment except a dictionary. Rappahannock officials did not initially attempt to address Latson's mental health needs.

Three days after his arrival at Rappahannock, Latson, who was psychologically distressed, was evaluated by a psychiatrist. The psychiatrist concluded that Latson was suicidal, prescribed antipsychotic medication, and ordered Latson moved to a crisis cell for suicide watch. On April 24, 2014, a corrections officer who was placing Latson in the crisis cell ordered Latson to put his hands on the wall and then physically pushed him against the wall. Latson, in the midst of a diagnosed mental health crisis, reacted to this physical force with a fight-or-flight response that is symptomatic of ASD and lashed out, striking the officer.

Three correctional officers then surrounded Latson, and First Sergeant William Diehl tasered Latson for the full five-second Taser cycle, causing neuromuscular incapacitation. Latson collapsed to the floor. At the direction of First Sergeant Diehl, Latson was placed in handcuffs and leg irons and was seen by a nurse, who removed the Taser probes. After the incident, Latson was placed in a Pro-Straint chair in the crisis cell, and at the direction of First Sergeant Diehl, four

correctional officers strapped Latson to the chair. A Pro-Straint chair has a straight back and straps that are used to fully restrain an inmate's legs, arms, waist, and chest.

Officers checked on Latson every fifteen minutes while he was in the Pro-Straint chair, and for all checks performed within the first hour and a half, he was noted to be either quiet or responsive. For the next four and a half hours, he was noted to be quiet. The officers left him in the Pro-Straint chair, unable to move, eat, or use the restroom, for more than nine hours. When he was released from the Pro-Straint chair, he received a snack bag and milk but was given no dinner.

Following this incident, Latson was placed in a crisis cell on modified suicide watch for one week. The cell contained a safety mattress but had no toilet, toiletries, or other furnishings. He was then removed from the crisis cell and placed in administrative segregation. While Latson was in segregation, Rappahannock mental health staff only conducted suicide watch checks to ensure he was not in immediate physical danger. Rappahannock staff prevented Latson from receiving mental health testing or treatment. Latson remained in segregation for more than one month, until he was transferred to MCTC on June 5, 2014.

Within a day of his arrival at Rappahannock, Latson was placed into the legal custody of the VDOC, despite continuing to be housed at a regional jail. Clarke had discretion to determine the priority for receiving prisoners in VDOC

custody from local facilities into state-operated facilities and to order transfers of prisoners. Within a week of Latson's arrival at Rappahannock, VDOC representatives were notified of Latson's conditions and treatment at Rappahannock. Clarke, however, did not immediately transfer Latson to a different facility.

On April 30, 2014, while Latson was restrained in the Pro-Straint chair, clinical psychologist Susan Williams emailed mental health clinician Richard Feldman, copying Keith Dawkins and Eric Madsen, all of whom were VDOC employees, requesting that Feldman meet with Latson to consider whether he should be transferred to a VDOC facility sooner than planned. Williams wrote that VDOC needed a report of Latson's mental status and how he was being managed at Rappahannock.

On May 8, 2014, Feldman met with Latson and reported that Latson was manageable with close monitoring and regular contact with treatment staff. Feldman conveyed his belief that Latson was being singled out by correctional officers for ridicule and mistreatment because the original offense that led to his incarceration was an assault of a police officer. Feldman observed that Latson was not delusional and did not show evidence of perceptual disturbances. Feldman noted that Latson had previously done very well at Northwestern Regional Adult Detention Center, where he had been in a sheltered housing situation.

On May 7, 2014, Latson's attorney communicated with VDOC about the possibility of transferring Latson to AdvoServ, a non-VDOC facility, before he had finished serving his active sentence. On May 20, 2014, counsel working on Latson's behalf sent a letter to the Governor of Virginia regarding Latson's conditions and treatment at Rappahannock and the effects on Latson's mental health. Latson's advocates continued to contact VDOC and other Commonwealth agencies throughout Latson's time at Rappahannock, alerting them to Latson's conditions and treatment and his diagnosed disabilities, and requesting that he be transferred to another facility. The Governor directed VDOC to transfer Latson to a VDOC facility as soon as possible, and Latson was transferred to MCTC on June 4, 2015.

Research has shown that the impacts of solitary confinement can be similar to those of torture and can include a variety of negative physiological and psychological reactions. These effects are amplified in individuals with mental illness and can exacerbate underlying conditions, especially in people with intellectual disabilities. Latson alleges that the defendants knew or should have known that placing him in segregation could be devastating to his mental health. In 2003, following a series of inmate suicides at the facility, a suicide consultant issued a report to Rappahannock recommending that isolation should be avoided and suicidal inmates should instead be housed close to staff in the general

population, mental health unit, or medical infirmary. The report also stated that restraints such as the Pro-Straint chair should be used only as a last resort.

In 2012, United States Immigration and Customs Enforcement ("ICE") inspected Rappahannock and recommended that Rappahannock adopt policies and procedures requiring removal of ICE detainees from their cells to use toilet facilities, when necessary, to protect the detainees' privacy and dignity. VDOC, the Commonwealth, and Clarke knew or should have known about the ICE report.

While he was in segregation at Rappahannock, Latson was provided no sensory stimulation. Specifically, he had no window, radio, reading materials, television, or means of tracking time. He could see only the walls and door of his cell. He was in segregation for more than a month and a half, during which time he was only removed from his cell when the cell was being cleaned.

Latson was criminally prosecuted for the incident that led to the use of the Pro-Straint chair. Latson pleaded guilty to the charge of assault on a police officer and was sentenced to an additional six months of imprisonment. A prominent corrections expert reviewed the handling of the offense and opined that, in accordance with the standard practices of other jails nationwide, the incident should have been treated as a mental health crisis and not as a criminal matter. The expert commented that criminally prosecuting such violations by mentally ill inmates can lead to a cycle of rule violations, punishment, segregation, and

exacerbation of mental illness, which in turn leads to more violations and increasingly severe punishment.

When he was moved to MCTC, a facility designed to house mentally ill inmates, Latson encountered conditions similar to those he had faced at Rappahannock. He was placed into segregation immediately upon his arrival at MCTC and remained there for nearly six months, with the exception of fourteen days in late September and early October when he was housed in the general population. He again had no access to reading materials, a radio, a television, a clock, or other stimulus while he was in his segregation cell. He could only access these items on days when he was allowed out of his cell for limited periods of time. For most of his incarceration at MCTC, Latson could only stare at the walls of his cell.

An MCTC policy requires a formal hearing when an offender is considered for removal from the general population, an increase in security level, or reduction in good-time earning level outside the annual review process. Nevertheless, Latson was not given a hearing before being placed into segregation. He received a hearing three weeks later.

On June 26, 2014, following his hearing, Latson was given a Segregation Release Plan ("SRP") that provided for limited temporary release three days per week for at least one hour. During the preceding three weeks, Latson was

permitted no temporary release. Latson was placed in disciplinary segregation at least three times for actions taken as a result of his ASD. While he was in disciplinary segregation, he was provided no time outside of his cell. On one occasion, he was kept in his cell for twenty consecutive days with no stimulus other than Bible pamphlets. When he was not in disciplinary segregation, Latson's out-of-cell time ranged from half an hour three days per week to one hour five days per week. On the remaining days, he was not permitted outside of his cell at all.

Throughout Latson's time at MCTC, Risk of Institutional Aggression forms noted that Latson posed a high risk of aggression towards others. The reasons stated for this assessment were that he had been convicted of assaulting a law enforcement officer, had mild ID and ASD, and had a history of low frustration tolerance and aggression. The defendants did not create a protocol to address Latson's disabilities, and they responded to his behavioral incidents with punishment rather than treatment.

On June 30, 2014, Latson's SRP was suspended and he was placed in disciplinary segregation for one week because he had thrown objects at his cell door and liquid under and around his cell door after becoming upset. He alleges this was an episodic outburst caused by his ASD. Latson was not given a hearing before being placed in disciplinary segregation. Advocates for Latson voiced concerns to an MCTC clinical social worker about the consequences of placing

Latson in segregation and asked that he have access to some sensory input, but that request was not fulfilled.

On July 11, 2014, Latson threw his coffee cup at the wall and pushed his breakfast tray through the slot in his cell door, striking an officer in the abdomen. He was forcibly extracted from his cell and suffered a laceration on his arm that required stitches. He was punished with twenty days of disciplinary segregation, but he was not placed back on an SRP until twenty-eight days after the incident. During his twenty-eight days in segregation, he was not allowed any time outside of his cell. For one month following the incident, he was deprived of a toothbrush. For nearly a month and a half, blood from the laceration on his arm remained in his cell. For more than two months, he was not given toilet paper.

By the time he was transferred to MCTC, Latson had already lost forty-two pounds since his arrest. Within ten days of his arrival at MCTC, he had lost an additional five pounds. Beginning a few days after his transfer, MCTC gave him Ensure twice a day in addition to his meals. However, following the July 11 incident, he no longer received Ensure despite pleas by those advocating on his behalf. In addition, Latson was not permitted to purchase anything from the commissary other than writing materials and hygiene supplies. Though no security reason was stated for the restriction, he was not permitted to order food or discretionary items that other inmates were allowed to order.

On June 18, 2014, an MCTC recreation therapist completed a Recreation Therapy Assessment of Latson. He noted that Latson had a slow learning ability and would need activities to help him cope with his environment. No such activities were implemented. While at MCTC, Latson received no mental health treatment aside from psychiatric medication. His advocates visited him on October 3, 2014, and were not permitted to complete a grievance form.

On October 5, 2014, Latson had an outburst in the cafeteria at breakfast. His SRP was suspended and he was placed in disciplinary segregation for twenty days. During that time, he was not allowed outside of his cell and had no access to music, books, magazines, radio, television, or canteen items. His only source of stimulus was a few Bible pamphlets. Latson alleges that because of his ASD, he is not deterred from future misconduct by discipline in the way that non-disabled inmates are deterred.

Latson avers that throughout his time at MCTC, Robichaux and Jarvis personally reviewed and approved decisions regarding his housing situation. Beginning the day after his arrival at MCTC, people advocating on Latson's behalf communicated with Robichaux and Jarvis about his diagnoses and expressed their concerns about his treatment and conditions of confinement, and the effects that isolation would have on his mental state. Latson's advocates also communicated with other staff members who were supervised by Robichaux and Jarvis. On June

5, 2014, Latons's attorney spoke with an MCTC employee to express his concern about Latson's segregation placement and to request that reading materials be made available. The employee responded that she would review the applicable policies and speak to security about his concerns.

VDOC employees working under Clarke's supervision were also informed of Latson's treatment and conditions of confinement throughout his placement at Rappahannock and MCTC. On July 9, 2014, Clarke sent Latson's attorney an electronic calendar invitation to speak about Latson on July 14, 2014. Clarke was copied on letters regarding Latson's situation at MCTC that Latson's counsel sent to the Governor on September 2, 2014, and November 21, 2014.

In late 2014, media sources including the *Washington Post* and the *New York Times* began publishing stories about Latson. The United States Department of Justice ("DOJ") interviewed Latson as part of an investigation into the Commonwealth's compliance with a settlement agreement involving accommodations for inmates with intellectual and developmental disabilities. Virginia's Protection and Advocacy Organization, a federally mandated program, sought information about his confinement. In December, 2014, Latson was transferred from administrative segregation to the general population at MCTC.

Latson's counsel submitted a formal pardon request to the Governor on January 12, 2015. The Governor granted a conditional pardon on January 20,

2015, approving Latson's transfer to AdvoServ, an out-of-state facility designed to serve individuals with intellectual and developmental disabilities. The Virginia Department of Medical Assistance Services had contemplated this placement as early as August, 2013, and had procured funding for it in October, 2013.

On January 20, 2015, after Latson was conditionally pardoned, he was returned to segregation. He was stripped of his possessions, had all of his privileges revoked, and was again denied access to books, television, telephone, the commissary, and his music player. Three days later, MCTC staff informed Latson's attorney that Latson had been placed in segregation for his own protection, but offered no explanation for the withdrawal of privileges and lack of stimulation. Latson's counsel then emailed several representatives of MCTC, VDOC, and the Virginia Department of Behavioral Health & Developmental Services ("DBHDS"), including Robichaux, alerting them to his segregation and removal of stimulus and privileges following the pardon, and expressing concern about the effect these conditions would have on Latson. His counsel had learned that Latson had no water in his segregation cell and was only given drinks at meals, and she had been told that after the pardon, staff had been handling him roughly, mocking and disparaging him, and threatening him about the pardon. Latson's counsel included this information in her emails to representatives of MCTC, VDOC, and DBHDS.

When Latson was removed from the general population and placed into segregation following his pardon, he was not placed in pre-hearing detention or given a formal hearing. Latson alleges that guards and other MCTC staff placed him in segregation as an act of retaliation against him for exercising his free speech rights to secure a pardon. As a result, his ability to communicate with his counsel, family, and others outside the facility was restricted; his mental condition was destabilized; and he feared further retaliation for future attempts to exercise his free speech rights.

Latson was transferred to AdvoServ on February 2, 2015. Though his mental health needs are being addressed there, Latson alleges that the defendants' actions caused him significant and potentially irreversible damage. He developed post-traumatic stress disorder ("PTSD") and other mood, anxiety, and panic disorders. He has had difficulty adapting to his new environment. Authority figures provoke severe anxiety and fear. Latson avers that he once showed promise of leading a relatively independent life in the least restrictive placement and maintaining employment, but it is now unlikely that he will achieve that level of independence in the foreseeable future. He relies on others to manage his heightened fear and reactivity in challenging interpersonal situations, and he is hypervigilant to signs of danger. He alleges that he will require long-term mental health treatment to address his anxiety, depression, social isolation, and sense of

hopelessness. Latson contends that his trauma was caused by the conditions of his confinement at Rappahannock and MCTC, and in particular, his lengthy placements in segregation and lack of stimulus.

Based on these allegations, Latson asserts seven claims. Count One is an Eighth Amendment claim regarding Latson's conditions of confinement, brought pursuant to 42 U.S.C. § 1983 against Robichaux, Jarvis, and Clarke in their individual capacities. Count Two is an Eighth Amendment claim brought pursuant to § 1983 against Robichaux, Jarvis, and Clarke in their individual capacities, regarding their alleged failure to provide medical care to Latson. Count Three is a Fourteenth Amendment due process claim brought pursuant to § 1983 against Robichaux, Jarvis, and Clarke in their individual capacities. Count Four is a Fourteenth Amendment equal protection claim brought pursuant to § 1983 against Robichaux, Jarvis, and Clarke in their individual capacities. Count Five is a First Amendment free speech retaliation claim brought pursuant to § 1983 against Robichaux and Clarke in their individual capacities. Count Six asserts a claim of violation of the Americans with Disabilities Act ("ADA") against Robichaux, Jarvis, and Clarke, in their official capacities, and MCTC, the Commonwealth of Virginia, and VDOC. Count Seven asserts a claim under the Rehabilitation Act ("RA") against Robichaux, Jarvis, and Clarke, in their official capacities, and MCTC, the Commonwealth of Virginia, and VDOC.

II.

Latson initially filed suit in the United States District Court for the Eastern District of Virginia on April 21, 2016, asserting claims against the defendants named here as well as parties associated with Rappahannock. *Latson v. Clarke*, No. 1:16-cv-00447-GBL-MSN (E.D. Va.). Clarke, MCTC, Robichaux, Jarvis, the Commonwealth, and VDOC moved to sever the claims against them from the claims against the Rappahannock parties and to transfer the severed claims to the Abingdon Division of the Western District of Virginia, in which MCTC is located. The court granted the Motion to Sever and Transfer Venue, finding that the two sets of claims were significantly different from one another and would require the presentation of different evidence and witnesses. Mem. Op. & Order 10-11 (E.D. Va. Oct. 14, 2016), ECF No. 79. The court also found that "trying the claims together may cause the jury to hold the Commonwealth Defendants liable for physical force the Complaint alleges occurred at the Rappahannock Jail only," prejudicing the defendants. *Id.* at 11.

After the severed claims were transferred to this court, Latson filed an Amended Complaint. The defendants have moved to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted, asserting a

number of grounds for dismissal. The Motion to Dismiss has been fully briefed and is now ripe for decision.[2]

III.

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992).

In ruling on a motion to dismiss, the court must regard as true all of the factual allegations contained in the complaint, *Erickson v. Pardus,* 551 U.S. 89, 94 (2007), and must view those facts in the light most favorable to the plaintiff. *Christopher v. Harbury,* 536 U.S. 403, 406 (2002). "Where, as here, the motion to dismiss involves a civil rights complaint, [I] must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might

---

[2]  I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

plausibly be suggested by the facts alleged." *Rios v. Veale*, 648 F. App'x 369, 370 (4th Cir. 2016) (unpublished).[3]

A. Events that Occurred at Rappahannock.

The defendants contend that they cannot be held responsible for actions taken by representatives of Rappahannock because local jails are operated by independent sheriffs and local jail authorities. The defendants had no authority over Rappahannock. They argue that while Clarke had discretion to transfer Latson from Rappahannock into a Commonwealth facility, he had no duty to do so. They further contend that the facts alleged do not demonstrate that Clarke had personal knowledge of Latson's conditions of confinement at Rappahannock.

Latson counters that because he was in VDOC custody while at Rappahannock, and Clarke had the power to remove him from that environment, Clarke can be held liable for constitutional violations that occurred there, as well as for violations of the ADA and RA. He further contends that by alleging that his advocates notified Clarke of constitutional violations, he has plausibly claimed that Clarke knew of the alleged violations, and any further examination of the defendants' knowledge should be left to a fact-finder.

The defendants are correct that Rappahannock, a regional jail, is operated by a regional jail authority and not by the Commonwealth. Va. Code Ann. §§ 53.1-

---

[3] I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

116.2, 53.1-106.  The Supreme Court of Virginia has held that employees of local and regional jails are not employees of the Commonwealth, and therefore the Commonwealth cannot be liable for their actions under a theory of *respondeat superior*.  *Doud v. Commonwealth*, 717 S.E.2d 124, 322 (Va. 2011).  Latson argues that his claims regarding Rappahannock are not premised on respondeat superior, but instead seek to hold Clarke, the Commonwealth, and VDOC[4] directly liable because Clarke had the power to transfer Latson to a different facility and did not do so for some time.

Va. Code Ann. § 53.1-20(B) generally provides that persons convicted of felonies shall be received into state facilities within sixty days of when a sentencing order is sent to the Director of VDOC.  Subsection (C) of the statute grants the Director discretion to determine the order in which prisoners will be received into state facilities, and subsection (D) provides that felons who have not been placed in VDOC facilities will serve their sentences in local facilities like Rappahannock.  As the defendants note, courts have held that this statute is merely a procedural device and does not create any constitutional right to transfer.  *Counts v. Newhart*, 951 F. Supp. 579, 584-85 (E.D. Va. 1996), *aff'd*, 116 F.3d 1473 (4th Cir. 1997); *see also Khaliq v. Angelone*, 72 F. App'x 895, 900 (4th Cir. 2003)

---

[4] Counts One, Two, and Four assert claims against Clarke for events that occurred at Rappahannock.  Counts Six and Seven assert claims against VDOC, the Commonwealth, and Clarke for events that occurred at Rappahannock.

(unpublished) (holding that inmates "had no federal right to be housed in any particular state facility, or in a state corrections facility as opposed to a local jail compensated by the state for the cost of incarcerating state inmates pending their transfer to an available and appropriate space within a state facility").

But these cases are not dispositive. As to Latson's ADA and RA claims, at least one court of appeals has held that a state cannot escape its obligations under the ADA and RA by housing inmates at third-party county prisons. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1069 (9th Cir. 2010). "At issue are [the state] defendants' own obligations under the ADA," and a state must "ensure ADA-compliant conditions for prisoners and parolees being held under its authority, whether it houses such persons in its own facilities or chooses to house them" at other facilities. *Id.* Here, VDOC has an obligation to ensure that its prisoners' rights under the ADA and RA are not being violated by the local and regional jails in which it chooses to house its prisoners. Although VDOC cannot control the actions of personnel at local and regional jails, it has the power and duty to house its prisoners where they will be free from discrimination and afforded required accommodations.

With regard to Counts One, Two, and Four, if Clarke knew that Latson's constitutional rights were being violated at Rappahannock while Latson was a VDOC-responsible inmate, then Clarke conceivably had a duty to halt any known

constitutional violations. While he could not control the actions of Rappahannock personnel, he had the power to end the alleged violations by transferring Latson to a VDOC facility, which he ultimately did. Notice of continuing harm and failure to exercise one's power to remedy that harm can establish personal involvement in a deprivation of rights for purposes of a § 1983 claim. *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985).

Of course, at this procedural stage, I cannot say what Clarke knew or when he knew it. At the summary judgment stage, the undisputed record evidence may show that he did not receive notice of the alleged events occurring at Rappahannock. But in ruling on the Motion to Dismiss, I must view the allegations in the light most favorable to Latson. The Amended Complaint alleges that VDOC representatives were notified of Latson's conditions and treatment at Rappahannock no more than a week into his approximately one and a half month stay there. A VDOC mental health clinician allegedly met with Latson at Rappahannock and expressed his concerns and recommendations in a written report. The Amended Complaint further alleges that Latson's attorneys and advocates contacted VDOC officials on several occasions regarding his treatment and conditions at Rappahannock. The Amended Complaint also alleges that VDOC, the Commonwealth, and Clarke knew or should have known about the ICE report regarding treatment of inmates at Rappahannock. I find that these

allegations are sufficient to state plausible claims that Clarke knew or should have known about Latson's treatment and conditions at Rappahannock. At this early stage of the case, that is enough for the claims based on events at Rappahannock to move forward.

### B. Statute of Limitations for ADA and RA claims.

The defendants next argue that the asserted ADA and RA claims are barred by the applicable statutes of limitations. The plaintiff and the defendants disagree as to what limitations period applies to these claims. The defendants contend that the applicable period is the one-year statute of limitations of the Virginia Rights of Persons with Disabilities Act, Va. Code Ann. § 51.5-46(B). Latson argues that the federal four-year catch-all limitations period applies here. 28 U.S.C. § 1658(a). In the alternative, he argues that Virginia's two-year personal injury limitations period applies. Va. Code Ann. § 8.01-243(A).

Given the similarities between the ADA and the RA, courts apply the same limitations period to claims under both acts. *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017). Because Title II of the ADA does not contain a statute of limitations, courts must either apply the federal four-year catch-all limitations period or the state statute of limitations for the most analogous state-law claim. *A Soc'y Without a Name, for People Without a Home, Millennium Future-Present v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011). The four-year

federal catch-all period applies only to claims arising under statutes enacted after December 1, 1990, and the ADA was enacted a few months before that, on July 26, 1990. *Id.* Therefore, as a general rule, "the one-year limitations period in the Virginia [Rights of Persons with] Disabilities Act applies to ADA claims brought in Virginia." *Id.* at 348. The ADA was amended, however, in 2008. ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (codified at 42 U.S.C. § 12102). If Latson's claim was made possible by the ADA Amendments Act rather than the pre-amendment ADA, then he can invoke the four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *Mercado v. Puerto Rico*, 814 F.3d 581, 589 (1st Cir. 2016).

Latson argues that his claim was made possible by the ADA Amendments Act because his condition is episodic in nature, and ASD and ID were not consistently recognized as disabilities under the original ADA. The ADA Amendments Act broadened the definition of "disability" under both the ADA and the RA. 42 U.S.C. § 12102(4)(A) ("The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."). The amendments to the ADA expressly included episodic impairments in the definition of disability and provided that mitigating measures such as medication should not be considered in

determining whether an impairment substantially limits a major life activity and thus qualifies as a disability. 42 U.S.C. § 12101(4)(D), (E).

Recent regulations clearly indicate that ASD now qualifies as a disability under the amended version of the ADA. 29 C.F.R. § 1630.2(j)(3)(iii); 28 C.F.R. § 35.108(d)(2)(iii)(E). It is not clear, however, that ASD and ID, as they affect Latson, would have been recognized as disabilities prior to the ADA Amendments Act.

The defendants assert that ASD and ID were recognized as disabilities under the ADA prior to 2008, but they have not pointed to any controlling case actually holding that ASD and ID qualified as disabilities under the pre-amendment ADA. In most of the cases cited by the defendants, the court either assumed these conditions were disabilities without deciding the point, or the parties agreed that ASD and ID were disabilities and did not present the issue to the court. *See, e.g.*, *Roe ex rel. Preschooler II v. Nevada*, 332 F. Supp. 2d 1331, 1340 (D. Nev. 2004) (stating that defendants did not contest that the plaintiff had a disability under the ADA or was handicapped under the RA); *Hahn ex rel. Barta v. Linn Cty.,* 130 F. Supp. 2d 1036, 1045 (N.D. Iowa 2001) (noting that whether plaintiff was a qualified individual with a disability was not in dispute). Additionally, it is not apparent from the face of the Amended Complaint that ASD is an ever-present rather than episodic disorder. The defendants' arguments about the nature of ASD

and ID raise issues of fact that go beyond the four corners of the Amended Complaint.

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Therefore, the question of whether a claim is time-barred usually cannot be resolved on a motion to dismiss, except "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint." *Id.*

Here, based solely on the allegations in the Amended Complaint, I cannot say for certain that Latson's ADA and RA claims would have been cognizable prior to the 2008 ADA Amendments Act. Though it seems unlikely, the evidence may show that Latson's impairment is episodic, or that the mediation of his condition through medication and treatment would have negated his claims under the pre-amendment version of the ADA. The statute of limitations issue raised by the defendants is not one that I can resolve at this procedural stage. I will thus deny at this point the Motion to Dismiss to the extent it argues the plaintiff's ADA and RA claims are time-barred.

## C.    MCTC as a Separate Party.

The defendants contend that MCTC must be dismissed because it is a VDOC facility, not a separate legal entity.  The defendants note that the Code of Virginia does not grant individual correctional facilities the capacity to sue or be sued.  The claims asserted against MCTC are the same as those asserted against VDOC, so the defendants assert that the plaintiff has nothing to gain from separately naming MCTC as a defendant.

Latson does not cite any authority for the proposition that MCTC is a separate legal entity from VDOC, and I am aware of none.  The capacity to sue or be sued is determined by state law.  Fed. R. Civ. P. 17(b)(3).  A state correctional facility is defined as "any correctional center or correctional field unit used for the incarceration of adult offenders established and *operated by the Department of Corrections*, or operated under contract pursuant to § 53.1-262," and includes penitentiaries.  Va. Code Ann. 53.1-1 (emphasis added).  The Director of VDOC has the duty and power to supervise and manage state correctional facilities.  Va. Code Ann. § 53.1-10(1).  The State Board of Corrections owns the real and personal property of state correctional facilities and is the party authorized to sue to protect that property.  Va. Code Ann. § 53.1-18; *see also* § 53.1-31.  It appears that no Virginia statute grants state correctional facilities such as MCTC the capacity to

sue or be sued. I find that MCTC is not a proper party and will grant the Motion to Dismiss as to MCTC.

### D. Proper Defendants for ADA and RA Claims.

The Amended Complaint asserts claims for violation of the ADA and RA against Robichaux, Jarvis, and Clarke, all in their official capacities, as well as MCTC, VDOC, and the Commonwealth of Virginia. The defendants urge the court to dismiss these claims against Robichaux, Jarvis, and Clarke because a suit against an individual in his or her official capacity is, for all intents and purposes, a suit against the individual's employer or principal. The defendants thus argue that naming the individual defendants is redundant. They also move to dismiss the Commonwealth for the same reason, as VDOC is an arm of the Commonwealth and any monetary relief against either of these entities would be paid from the same coffers.

Latson responds that discovery is needed to determine which of the individual defendants are agents of which of the entity defendants. Latson further asserts that the allegations show that VDOC and the Commonwealth played different roles with respect to Latson, as the Commonwealth granted him a conditional pardon and VDOC officials allegedly retaliated against him for seeking that pardon.

"As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Where a plaintiff has named the entity as well, an official-capacity claim can be dismissed as duplicative. *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004). Discovery regarding agency can occur without the individual agents being named parties to the suit. And while the plaintiff's theory of the case treats VDOC and the Commonwealth differently, for purposes of defending against the plaintiff's claims and paying any potential damages, they are one and the same. I agree that the ADA and RA claims against defendants other than VDOC are redundant, and I will grant the Motion to Dismiss those claims against Robichaux, Jarvis, and Clarke in their official capacities, and against the Commonwealth of Virginia.

E.    Viability of ADA Claim.

The defendants have moved to dismiss Count Six of the Amended Complaint for failure to state a cognizable ADA claim. According to the defendants, Latson does not allege that he was excluded from services, programs, or activities at MCTC, nor does he allege that he was treated differently from non-disabled inmates. Pointing to *Mason v. Correctional Medical Services, Inc.*, 559 F.3d 880, 886 (8th Cir. 2009), the defendants assert that a prison is not required to provide auxiliary aids and services to an inmate if doing so would be unduly

burdensome.  The defendants further argue that the allegations show that the plaintiff was disciplined because of his misbehavior, not because of his disabilities.

Latson responds that the defendants' motivation for placing him in segregation is a factual issue that cannot be decided on a motion to dismiss.  He contends that his outbursts were inextricably linked to his disabilities, and at least one Court of Appeals has recognized that aggression is a common symptom of autism.  *Drew P. v. Clarke Cty. Sch. Dist.*, 877 F.2d 927, 928 n.1 (11th Cir. 1989).  Latson also cites *Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 576 (S.D.N.Y. 2014), in which the district court held that the question of whether autism caused certain behavior was a factual issue that precluded summary judgment.

Latson further notes that the Second Circuit held in *Wright v. New York State Department of Corrections & Community Supervision*, 831 F.3d 64, 73 (2d Cir. 2016), that preventing a disabled prisoner's access to the law library, recreation, and work programs were examples of denial of meaningful access to services, programs, and activities.  Another district court has ruled that a prison must evaluate a disabled inmate's needs and the accommodations necessary to ensure reasonable access to prison services, and failure to do so violates the ADA and RA as a matter of law.  *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 271-72 (D.D.C. 2015).

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). To state a claim for violation of Title II, the plaintiff "must allege that (1) [he] has a disability, (2) [he] is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) [he] was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [his] disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

The defendants do not contest the first element. They appear to argue that Latson was not otherwise qualified because of his asserted disciplinary infractions, but that is a factual issue that is not properly resolved on a motion to dismiss. Whether the provision of certain auxiliary aids or services would be unduly burdensome is likewise a factual issue. The defendants' argument that Latson did

not plead a denial of benefits is unavailing, as they themselves seem to implicitly acknowledge in their reply brief. I find that Latson has stated a plausible claim of violation of the ADA, and I will deny the Motion to Dismiss as to Count Six.

F.      Viability of RA Claim.

Though the ADA and RA are quite similar, the RA has a different causation standard: the plaintiff's disability must be the sole reason for the alleged discrimination. 29 U.S.C. § 794(a). The defendants contend that the Amended Complaint's allegations show that the defendants' actions were not taken solely because of Latson's disability, but rather because of his behavior.

Latson asserts that he has pleaded facts that satisfy the RA's causation standard. The Amended Complaint alleges that the defendants were aware of plaintiff's diagnoses and in spite of that knowledge, they (1) failed to provide appropriate accommodations, and (2) removed Latson from the general prison population solely because of his disabilities, depriving him of benefits and services and subjecting him to destructive conditions.

The Fourth Circuit recently reaffirmed that the RA has a stricter causation requirement than the ADA, "under which the disability can be one of multiple causes." *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 641 (4th Cir. 2016). "In order to establish a violation of the Rehabilitation Act for disparate treatment, a plaintiff must prove: (1) that he has a disability; (2) that he is

otherwise qualified for the . . . benefit in question; and (3) that he was excluded from the . . . benefit due to discrimination solely on the basis of the disability." *Atkins v. Holder*, 529 F. App'x 318, 319–20 (4th Cir. 2013) (unpublished).

Latson has alleged that his behavior was caused by and inextricably linked to his disabilities. He has alleged that the defendants severely punished him for what were essentially symptoms and manifestations of his disabilities. At this procedural stage, I find that Latson has set forth sufficient allegations for his RA claim to move forward. Because I find that he has stated a plausible claim under the RA, I will deny the Motion to Dismiss as to Count Seven.

G.    Individual Defendants' Personal Involvement in Alleged Acts.

The defendants contend that Latson's § 1983 claims should be dismissed because he has not specifically alleged the personal involvement of each individual defendant. The Amended Complaint admits that Latson does not know the identities of the persons who placed him in segregation after he was conditionally pardoned. The defendants assert that Clarke, who is based in Richmond, could not have been involved in the day-to-day operations of MCTC. Regarding the failure to provide Latson a hearing before placing him in segregation, the defendants argue that the plaintiff does not allege who was responsible for providing a hearing. The defendants suggest that neither Clarke nor the warden would have had that responsibility. Finally, the defendants contend that knowledge of a DOJ

investigation of MCTC does not create sufficient notice of constitutional violations, as Latson does not allege that the DOJ issued any findings.

In response, Latson states that the allegations show that the defendants were continually made aware that he was being treated inhumanely and that his mental state was deteriorating. The Amended Complaint alleges that Robichaux was notified of violations and that Robichaux and Jarvis personally reviewed and approved decisions regarding plaintiff's housing situation. The Amended Complaint further alleges that the individual defendants had primary responsibility for operation of MCTC, set policies and procedures, and directly supervised employees. Therefore, according to Latson, the allegations show that the individual defendants were personally aware of and involved in the continued deprivation of his rights.

Under 42 U.S.C. § 1983, "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Therefore, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*

> For supervisory prison officials to be held liable under § 1983 for constitutional injuries inflicted by their subordinates, an inmate must establish that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) the supervisor's response to this knowledge was so inadequate as to show

deliberate indifference or tacit authorization of the offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered.

*Wilkins v. Upton*, 639 F. App'x 941, 945 (4th Cir. 2016) (unpublished) (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). "Receipt of letters by prison officials may be evidence of personal knowledge of unconstitutional conditions." *Wright*, 766 F.2d at 850.

Latson's allegations fall close to the line separating vicarious liability from direct liability. However, I find that he has pleaded enough facts regarding the involvement of the individual defendants to state plausible claims against them pursuant to § 1983. The plaintiff has alleged that Robichaux and Jarvis personally reviewed and approved decisions regarding his segregation and treatment, which plausibly includes decisions about his medical care and the failure to provide a pre-segregation hearing. These allegations, if true, could show their direct involvement; Latson does not seek to hold them liable merely on the ground that they supervised employees who deprived him of his constitutional rights.

The Amended Complaint's allegations with respect to Clarke are somewhat weaker, but I find that they satisfy the elements recited in *Wilkins*. The plaintiff has alleged that Clarke sent Latson's attorney an electronic calendar invitation to speak about Latson, presumably in response to complaints voiced by the attorney. The plaintiff has further alleged that Clarke was copied on letters that Latson's

counsel sent to the Governor regarding Latson's situation at MCTC. A reasonable inference from the Amended Complaint is that Clarke was aware of the DOJ's investigation and interview of Latson and that he also learned of the national press attention surrounding Latson's conditions and treatment. Viewed in the light most favorable to Latson, the alleged facts could show that the behavior discussed in these communications and publications demonstrated a pervasive and unreasonable risk of constitutional injury, and yet Clarke failed to take any action, which a fact finder could conclude demonstrated deliberate indifference or tacit authorization of Latson's treatment at MCTC. A jury may find that had Clarke intervened, Latson would have received treatment for his disabilities and been removed from segregation or provided with the needed stimulus to prevent the deterioration of his condition. A jury could also find that Clarke would have prevented Latson from being placed into segregation without a hearing following his transfer from Rappahannock, and that Clarke would have directed that Latson be placed in a less harsh environment following his pardon. Latson has thus adequately pleaded the causation element.

I find that Latson has alleged sufficient facts to establish claims of direct liability under § 1983 as to Robichaux, Jarvis, and Clarke.

H.     Viability of Conditions of Confinement Claim.

The defendants contend that, for various reasons, Count One of the Amended Complaint fails to state a claim upon which relief can be granted.  The defendants assert that Latson had no right to avoid uncomfortable prison conditions and that the Eighth Amendment only protected him from conditions that imposed atypical and significant hardships — a standard they argue the alleged facts do not meet as a matter of law.  The defendants point to cases in which the Fourth Circuit has held that lengthier periods of solitary confinement did not constitute cruel and unusual punishment.  *See Mickle v. Moore* (*In re Long Term Admin. Segregation of Inmates Designated as Five Percenters)*, 174 F.3d 464, 471-73 (4th Cir. 1999); *Williams v. Branker*, 462 F. App'x 348, 354 (4th Cir. 2012) (unpublished).  The defendants also argue that the plaintiff had no right to choose where he was housed and that the defendants had a duty to protect him from harm caused by other inmates.

The defendants argue that lack of stimulation, inability to purchase food, and inability to purchase discretionary items do not amount to constitutional violations.  They argue that Latson's weight loss and intermittent receipt of Ensure do not show that he was deprived of adequate food.  The defendants likewise argue that the lack of a toothbrush and toilet paper and the extended presence of blood in Latson's cell did not violate the Eighth Amendment because they did not deprive

Latson of a single, identifiable human need. They contend that their decision to segregate Latson was based on his risk of aggression toward others, and that their decision is entitled to deference.

The defendants argue that Latson cannot recover for any mental or emotional injury without showing that he suffered a physical injury. They assert that his alleged conditions of confinement were less severe than others which the Fourth Circuit has found to be constitutional. *See Beverati v. Smith*, 120 F.3d 500, 503-04 (4th Cir. 1997). They further argue that Latson has not adequately alleged that the defendants had actual knowledge of his conditions of confinement, and that complaints by Latson's family and friends do not show actual knowledge on the part of the defendants.

The defendants contend that Latson's allegations are insufficient to establish supervisory liability because they do not show that the defendants were deliberately indifferent to Latson's health or safety. They argue that any injuries Latson suffered could have been caused by events that occurred before he was transferred to Rappahannock and MCTC. They contend that he cannot use § 1983 to assert claims against individual officials that seek to vindicate rights create by the ADA and RA.

Finally, regarding his post-pardon conditions, the defendants note that Latson agreed to remain at MCTC while awaiting transport to AdvoServ.

Therefore, they assert that he consented to his conditions of confinement between the date of his pardon and the date of his release from MCTC.

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). It "imposes a duty on prison officials to provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, he suffered a deprivation that was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). Moreover, "[a] prisoner states a claim under the Eighth Amendment when he plausibly alleges that the conduct in question was motivated by a desire to harass or humiliate rather than by a legitimate justification, such as the need for order and security." *King v. Rubenstein*, 825 F.3d 206, 219 (4th Cir. 2016). Conditions that do not violate the Eighth Amendment on their own may amount to cruel and unusual punishment

when combined if "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise — for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

I find that Latson has stated a plausible conditions of confinement claim. Several of the defendants' arguments rely on alleged facts not apparent from the face of the Amended Complaint and require credibility determinations; thus, they cannot be resolved on a motion to dismiss. While the Fourth Circuit has held that similar conditions of confinement complied with the Eighth Amendment, I cannot say at this stage of the proceedings, without the benefit of any evidence, that Latson's conditions were identical or even comparable to those addressed in the other cases cited by the defendants. It is plausible that the alleged conditions combined to deprive Latson of the single, identifiable human need of mental health and sanity.

I find that Latson has pleaded sufficient facts that, if true, could show that the defendants had actual knowledge of his mental health and medical conditions and of his conditions of confinement. The defendants' actual state of mind is a question of fact. As for the lack of a physical injury, Latson is only required to show a serious *risk* of physical or emotional harm. *Shakka*, 71 F.3d at 166. I find that he has alleged facts that plausibly show such a risk. I will deny the Motion to

Dismiss to the extent that it is based on a purported failure to state a conditions of confinement claim upon which relief can be granted.

## I.    Viability of Lack of Medical Care Claim.

The defendants move for dismissal of Count Two on the ground that it fails to state a cognizable claim for violation of the Eighth Amendment based on a lack of adequate medical care.  They assert that they are not medical professionals and were not required to ensure that medical staff employed proper medical procedures or provided appropriate treatment.  They also argue that Latson has not pleaded facts showing the individual defendants' personal involvement in any denial of treatment, nor has he alleged facts that could establish supervisory liability.  The defendants point to Latson's allegation that he was given antipsychotic medication as a concession that he did, in fact, receive mental health treatment.

"[A] prison official's deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *Scinto*, 841 F.3d at 225.  "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."  *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017).

Allegations that the plaintiff's condition was "longstanding, pervasive, well-documented, and expressly noted by prison officials" are sufficient to show

deliberate indifference. *Scinto*, 841 F.3d at 229. The Fourth Circuit has held that "a doctor's failure to provide care that he himself deems necessary to treat an inmate's serious medical condition may constitute deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014). Prison officials who are not medical providers can exhibit deliberate indifference to serious medical needs by intentionally denying access to care or intentionally interfering with prescribed treatment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "[T]he mere fact that prison officials provide some treatment does not mean they have provided *constitutionally adequate* treatment." *Heyer*, 849 F.3d at 211. The treatment provided by a prison must be adequate to address the prisoner's serious medical need. *Id.*

I find that Count Two states a plausible § 1983 claim for violation of the Eighth Amendment based on denial of adequate medical care. The defendants do not dispute that Latson had serious medical needs. Latson has alleged that medical staff prescribed certain treatment and that the individual defendants prevented or interfered with the provision of that treatment. These allegations are adequate to state a claim, and I will deny the Motion to Dismiss to the extent it argues that Count Two does not set forth a viable Eighth Amendment claim.

J.     Viability of Due Process Claim.

The defendants seek dismissal of Count Three, arguing that it fails to state a claim upon which relief can be granted.   They argue that Latson had no constitutionally protected interest in avoiding segregation, and that he has not alleged that the MCTC policy requiring a pre-segregation hearing was a state regulation sufficient to create a constitutional interest.   The defendants argue that their alleged failure to follow an internal policy or procedure does not create a constitutional claim.   They further contend that the alleged conditions of confinement were not extreme enough to require procedural protection, and in any event, MCTC's process was sufficient.   Though Latson did not receive a pre-segregation hearing, he alleges that he received one several weeks after being placed in segregation and that his SRP was suspended and reinstated several times, which the defendants contend shows adequate process was provided.

To state a procedural due process claim, a plaintiff must allege facts showing that (1) he had a protectable liberty interest, and (2) he was not afforded minimally adequate process to protect his liberty interest.   *Incumaa v. Stirling*, 791 F.3d 517, 526 (4th Cir. 2015).   Prisoners have an interest in avoiding hardships that are "atypical and significant . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).   Though the constitution itself does not create a protected interest in avoiding specific prison conditions, "a liberty

interest in avoiding particular conditions of confinement may arise from state policies or regulations." *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005).

In *Wilkinson*, the Supreme Court found that certain conditions of segregated confinement which "standing alone might not be sufficient to create a liberty interest, taken together . . . impose an atypical and significant hardship within the correctional context." 545 U.S. at 224. Therefore, the conditions alleged gave rise to a protected liberty interest. *Id.* The Court focused on the severe limitation of human contact, that placement in segregation was indefinite, and that placement disqualified inmates from parole eligibility. *Id.* However, the Court found that the state's policy regarding placement of prisoners in segregation provided sufficient procedural protection of that interest. *Id.* The Court reached this conclusion in part because the policy offered the inmate notice of the reasons he was being placed in segregation and an opportunity to rebut those reasons. *Id.* at 226-27. The policy also provided multiple levels of review of decisions recommending segregation, as well as a review thirty days after an inmate's placement into segregation. *Id.* at 227.

The Fourth Circuit has held that in order to state a procedural due process claim, "inmates must first establish that an interest in avoiding onerous or restrictive confinement conditions arises from state policies or regulations (e.g., a regulation mandating periodic review)." *Incumaa v. Stirling*, 791 F.3d 517, 527

44

(4th Cir. 2015). Once the prisoner has cleared that hurdle, the next question —
whether the alleged conditions are atypical and substantially harsh — is a fact-
specific one. *Id.* The court must first determine the ordinary incidents of prison
life for the particular inmate, and then the court must determine whether the
alleged "conditions impose atypical and substantial hardship in relation to that
norm." *Id.* at 527. The fact-intensive nature of this inquiry makes it difficult to
resolve on a motion to dismiss.

Here, Latson has alleged conditions of confinement that appear to be
analogous to those found to create a liberty interest in *Wilkinson*. He has plausibly
alleged that a policy of the Commonwealth mandated a pre-segregation hearing
and that he was not provided one. He has alleged that he was not given timely
opportunities to understand the reasons for his confinement or to rebut those
reasons. I conclude that Latson has stated a plausible procedural due process
claim, and I will deny the Motion to Dismiss to the extent that it contends that
Count III fails to state a viable claim.

## K.  Viability of Equal Protection Claim.

The defendants seek dismissal of Count Four for failure to state a claim on
which relief can be granted. The defendants assert that Latson's equal protection
claim is fatally flawed because he has not identified any other prisoners who were
treated differently than him. Instead, the defendants argue, Latson complains that

he was punished for actions that were manifestations of his disabilities and that he was not given accommodations. The defendants also contend that their treatment of Latson was rationally related to the legitimate penological interest in maintaining prison order and security, and that Latson has not alleged facts that would establish supervisory liability.

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *King*, 825 F.3d at 220. If the plaintiff has established disparate treatment, then the court will consider whether the difference in treatment is justified under the applicable level of scrutiny. *Id.*

I agree with the defendants that Latson has not stated a plausible equal protection claim. Viewing the allegations in the light most favorable to Latson, the Amended Complaint could be read to allege that non-disabled inmates were provided a pre-segregation hearing while he was not. Such an allegation would appear to be speculative at best, since the Amended Complaint does not identify any other inmates or allege any facts regarding the privileges they were afforded or whether they were similarly situated to Latson. Because Latson has failed to plead any disparate treatment on the basis of his disability, it is unnecessary to analyze

whether such treatment was justified under the applicable level of scrutiny. I will grant the Motion to Dismiss as to Count Four.

## L. Viability of First Amendment Claim.

In Count Five, Latson alleges that he exercised his constitutionally protected freedom of speech by communicating with his advocates and the Governor, and that Robichaux and Clarke retaliated against him by placing him in segregation and revoking all of his privileges after he was pardoned. He further alleges that this retaliation adversely affected the exercise of his rights because while in segregation, he could not communicate with people outside the prison, and he feared further retaliation, which had a chilling effect.

The defendants move to dismiss this count for failure to state a claim upon which relief can be granted. The defendants contend that the Amended Complaint does not allege facts showing that Robichaux and Clarke intended to retaliate against Latson for exercising his free speech rights. They assert that because Latson was the only pardoned inmate at MCTC, their sole option for housing him separately from the other inmates was to house him solitarily. They note that more than a week passed between when Latson applied for a pardon and when he was returned to segregation following his pardon, asserting that the passage of time shows that his placement into segregation was not a retaliatory act. The defendants also argue that Latson was placed in segregation for his own protection and that by

agreeing to remain at MCTC while awaiting transport to AdvoServ, Latson consented to the conditions of his confinement.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000). To state a First Amendment retaliation claim, Latson must allege facts showing that (1) he engaged in constitutionally protected speech, (2) the defendants took retaliatory action that adversely affected Latson's protected speech, and (3) "a causal relationship exists between [Latson's] speech and the [defendants'] retaliatory action." *Tobey v. Jones,* 706 F.3d 379, 387 (4th Cir. 2013).

The Amended Complaint easily satisfies the first element. An inmate has a First Amendment right to communicate with counsel. *Al-Amin v. Smith*, 511 F.3d 1317, 1333-34 (11th Cir. 2008). The First Amendment also protects an inmate's right to send non-legal personal correspondence. *See, e.g.*, *Hayes v. Idaho Corr. Ctr.*, No. 14-35078, 2017 WL 836072, at *4 (9th Cir. Mar. 3, 2017); *Berenguel v. Bell*, 283 F. App'x 293, 295 (5th Cir. 2008) (unpublished).

To establish that the defendants' alleged retaliatory action adversely affected Latson's speech, Latson must aver facts showing that "a similarly situated person of ordinary firmness reasonably would be chilled by the government conduct in

light of the circumstances presented in the particular case." *Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006). This is a fact-sensitive inquiry that requires the court to consider "the status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Id.* "[A] chill is likely when the state actor has engaged the punitive machinery of the government in order to punish an individual for speaking out." *Ruttenberg v. Jones,* 283 F. App'x 121, 130 (4th Cir. 2008) (unpublished).

Latson has adequately pleaded this element. He has alleged that following his pardon, when he was no longer a VDOC responsible inmate but was simply awaiting transfer to AdvoServ, he was subjected to severe conditions that are used to punish inmates for disciplinary infractions. He has alleged that the defendants stripped him of all of his privileges and not only housed him in a cell by himself, but deprived him of any kind of stimulus. Though I do not yet know what the evidence will show, it is difficult to imagine a legitimate reason for depriving a pardoned former inmate of things like books or his music player. A jury could conclude that the alleged retaliatory acts would chill the speech of a reasonable person in Latson's circumstances.

Latson must also show that but for his exercise of his First Amendment rights, Robichaux and Clarke would not have revoked all of his privileges and placed him in solitary confinement following his pardon. *See Hartman v. Moore*,

547 U.S. 250, 256 (2006) (explaining that "retaliation is subject to recovery as the but-for cause of official action offending the Constitution"); *Tobey*, 706 F.3d at 390–91. At this stage of the proceedings, I conclude that Latson has averred sufficient facts to satisfy this element. While Latson has alleged that he was physically placed into segregation by unknown correctional officers, he has also adequately alleged the personal involvement of Robichaux and Clarke, as explained above. Taken as a whole, the allegations suggest but-for causation; the Amended Complaint reveals no punitive or otherwise legitimate basis for the Spartan conditions to which Latson was allegedly subjected following his pardon. I find that Latson has adequately stated a claim of First Amendment Retaliation, and I will therefore deny the Motion to Dismiss to the extent it argues that Count Five fails to state a claim upon which relief can be granted.

M.    Eleventh Amendment Immunity from ADA Claim.

The defendants contend that the Eleventh Amendment renders them immune from liability under the ADA because Latson has not stated an actual Fourteenth Amendment violation. According to the defendants, if Latson's § 1983 claims are dismissed, his ADA claim must also be dismissed for lack of jurisdiction. Though they are not issues of subject-matter jurisdiction, Eleventh Amendment immunity questions should be resolved "as soon as possible after the State asserts its immunity." *Constantine*, 411 F.3d at 482.

Latson relies upon *Constantine* to argue that the Eleventh Amendment does not bar his ADA claim. Considering an Eleventh Amendment immunity challenge, the Fourth Circuit in *Constantine* concluded that "Title II of the ADA is valid [Fourteenth Amendment] § 5 legislation, at least as it applies to public higher education." *Id.* at 490. "Because Congress clearly expressed its intention to abrogate the States' Eleventh Amendment immunity, and did so pursuant to a valid exercise of constitutional authority, the Eleventh Amendment poses no bar to [the plaintiff's] claims under Title II of the ADA." *Id.* A year later, in an unpublished per curiam opinion, the Fourth Circuit declared that the Eleventh Amendment does not bar a prisoner's ADA claim against prison officials. *Pearson v. Cushwa*, 211 F. App'x 158, 159 n.* (4th Cir. 2006) (unpublished) (citing *Constantine*).

After *Constantine* was decided, however, the Supreme Court issued its decision in *United States v. Georgia*, 546 U.S. 151 (2006). In *Georgia*, a paraplegic state inmate asserted various claims against the state, including claims for money damages under Title II of the ADA. *Id.* at 156. The plaintiff had "alleged deliberate refusal of prison officials to accommodate [his] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs." *Id.* at 157.

Finding that these allegations plausibly stated violations of both the Eighth Amendment and Title II of the ADA, the court noted that the plaintiff's "claims for

money damages against the State under Title II were evidently based, at least in large part, on conduct that independently violated the provisions of § 1 of the Fourteenth Amendment." *Id*. Thus, the ADA claims in *Georgia* differed from those in prior Supreme Court cases that had not been premised upon unconstitutional acts. *Id*. at 157-58. The Court declared that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id*. at 159. The Court suggested that the lower court should determine,

> on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id*. In accord with the Supreme Court's instruction, I will apply this framework to analyze whether the Eleventh Amendment bars Latson's ADA claim.

In his ADA claim, Latson contends that the defendants failed to accommodate his disabilities and denied him benefits and services because of his disabilities by (1) placing him or allowing him to remain in solitary confinement for extended periods, (2) denying him social interaction and other stimulus, (3) placing him in a generalized, non-accommodating correctional setting, and (4) denying him reasonable standards of hygiene. Latson asserts that he was placed in

increasingly severe and punitive conditions as a result of behavior that was a manifestation of his disabilities. He alleges that the defendants acted intentionally or with deliberate indifference to the likelihood that pursuit of these actions and adoption of policies that led to these actions would violate Latson's rights and risk serious harm. I concluded above that these allegations state a viable ADA claim.

With the exception of his placement in a generalized, non-accommodating correctional setting, these allegations overlap with Latson's Eighth Amendment claims, which I have concluded are viable § 1983 claims. In *Georgia*, the Supreme Court found it "quite plausible that the alleged deliberate refusal of prison officials to accommodate Goodman's disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs" violated both the ADA and the Fourteenth Amendment, which incorporates the Eighth Amendment's prohibition of cruel and unusual punishment. *Id.* at 157.

I conclude that Latson's ADA claim is based on alleged conduct that, if true, violated the Fourteenth Amendment. To the extent that his ADA claim is based on a failure to accommodate that prevented him from accessing services such as the law library or educational materials, which he apparently could not access while in segregation, the Fourth Circuit's decision in *Constantine* leads me to conclude that Congress validly abrogated the states' Eleventh Amendment immunity as to such claims. *See also Tennessee v. Lane*, 541 U.S. 509, 533-34 (2004) (holding that

Title II of the ADA, "as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment"). The Eleventh Amendment therefore does not bar Latson's ADA claim, and I will deny the Motion to Dismiss to the extent it is based upon Eleventh Amendment immunity.

N.    Qualified Immunity as to § 1983 Claims.

The defendants contend that they are entitled to qualified immunity on Latson's § 1983 claims. A § 1983 claim requires proof of the following three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford,* 119 F.3d 1156, 1159–60 (4th Cir. 1997). While state officials sued in their official capacities are not "persons" under § 1983, *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989), state officials sued in their individual capacities are "persons" within the meaning of the statute and are not absolutely immune from suit, *Hafer v. Melo,* 502 U.S. 21, 31 (1991). A government official sued in his individual capacity under § 1983 may, however, be entitled to qualified immunity. *Id.* at 25 ("[O]fficials sued in their personal capacities . . . may assert personal immunity defenses such as objectively reasonable reliance on existing law.")

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory

or constitutional rights within the knowledge of a reasonable person." *Meyers v. Baltimore Cty.,* 713 F.3d 723, 731 (4th Cir. 2013). A defendant asserting qualified immunity has the burden of proving the defense. *Id.* Qualified immunity is immunity from suit rather than merely immunity from liability; therefore, the question of qualified immunity should be decided before trial. *Id.* Of course, at the motion to dismiss stage, I can only consider the facts alleged by the plaintiff and must view them in the light most favorable to the plaintiff. "Most often, however, qualified immunity is tested at the summary judgment stage after the facts have been developed through discovery." *Alford v. Cumberland Cty.*, No. 06-1569, 2007 WL 2985297, at *3 (4th Cir. Oct. 15, 2007) (unpublished).

A court deciding the applicability of qualified immunity must determine "whether a constitutional violation occurred" and "whether the right violated was clearly established." *Tobey*, 706 F.3d at 385. Where a plaintiff "(1) allege[s] a violation of a right (2) that is clearly established at the time of the violation," a motion to dismiss on qualified immunity grounds must be denied. *Evans v. Chalmers,* 703 F.3d 636, 646 (4th Cir. 2012).

I have concluded that Counts One, Two, Three, and Five of the Amended Complaint allege plausible violations of constitutional rights. I must now attempt to define the specific rights alleged to have been violated and determine whether those rights were clearly established at the time of the events alleged in the

Amended Complaint. The rights must be defined at the appropriate level of specificity, neither too narrowly nor too generally. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003).

Regarding Count One, a prisoner has an Eighth Amendment right to humane conditions of confinement, which includes a right to receive adequate food, medical care, and exercise. *Farmer*, 511 U.S. at 832; *Wilson*, 501 U.S. at 304-05. The Eighth Amendment guarantees a prisoner's right to receive the "minimal civilized measure of life's necessities." *Id*. at 298. A prisoner has a right to avoid deprivations that are not motivated by any legitimate penological justification, such as the need for order and security. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981).

These rights were clearly established at the time of the events described in the Amended Complaint. Because Latson has claimed that several conditions of confinement combined to deprive him of the single, identifiable human need of mental health and sanity, it is difficult to define the rights at issue any more narrowly at this stage without improperly importing the specific facts of this case into the definition of the rights allegedly violated. *See Tolan*, 134 S. Ct. at 1866 (noting that "courts must take care not to define a case's context in a manner that imports genuinely disputed factual propositions"); *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (stating that for a right to have been clearly

established, "there need not exist a case on all fours with the facts at hand"). I find that the individual defendants are not entitled to qualified immunity as to Count One at this early procedural stage.

As to Count Two, the specific right at issue is defined as "the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs." *Scinto*, 841 F.3d at 236. That right, as noted by the Fourth Circuit, has been clearly established for many years. *Id.* Therefore, the defendants are not entitled to qualified immunity as to Count Two.

Count Three alleges that the individual defendants violated Latson's Fourteenth Amendment right to receive minimally adequate process — specifically, compliance with a VDOC policy requiring a pre-segregation hearing — prior to being deprived of his protected liberty interest in avoiding atypical and significant hardship. *See Incumaa*, 791 F.3d at 526. The Fourth Circuit declared in 2005 that a severe limitation of human contact, indefinite placement in segregation, and disqualification from parole eligibility combined to create an atypical and significant hardship. *Wilkinson*, 545 U.S. at 224. The VDOC policy described in the Amended Complaint would have plainly informed the individual defendants of the process required before imposing such a hardship. Therefore, based on the Amended Complaint's allegations, the individual defendants are not at this point entitled to qualified immunity s to Count Three.

Finally, in Count Five, Latson has alleged that the individual defendants violated his First Amendment right to be free from retaliation for communicating with counsel and others outside the prison. This right was clearly established at the time of the Amended Complaint's alleged events. *See, e.g.*, *Suarez*, 202 F.3d at 685; *Al-Amin*, 511 F.3d at 1333-34; *Witherow v. Paff*, 52 F.3d 264, 265 (9th Cir. 1995). The individual defendants thus are not entitled to qualified immunity as to Count Five.

III.

For the foregoing reasons, it is **ORDERED** as follows:

1.     The Motion to Dismiss, ECF No. 93, is GRANTED IN PART AND DENIED IN PART;

2.     The Motion to Dismiss is GRANTED as to Marion Correctional Treatment Center, which is DISMISSED as a defendant;

3.     The Motion to Dismiss is GRANTED as to Count Four;

4.     Counts Six and Seven are DISMISSED as to defendants Robichaux, Jarvis, and Clarke in their official capacities;

5.     The Commonwealth of Virginia is DISMISSED as a defendant; and

6.     The Motion to Dismiss on all other grounds is DENIED.

ENTER:  April 20, 2017

/s/  James P. Jones
United States District Judge