# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **REGINALD CORNELIUS LATSON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16CV00039 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD W. CLARKE, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Caitlin Marie Kasmar, Andrew R. Louis, and John Bell Williams III, Buckley Sandler LLP, Washington, D.C., for Plaintiff; Jeff W. Rosen and Christina E. Cullom, Pender & Coward, PC, Virginia Beach, Virginia, and Laura Maughan, Office of the Attorney General, Richmond, Virginia, for Defendants.*

The plaintiff, Reginald Cornelius Latson, now 26 years old, is a former prison inmate with the Virginia Department of Corrections ("VDOC"). He is alleged to suffer from autism spectrum disorder ("ASD"), post-traumatic stress disorder ("PTSD"), and intellectual disability ("ID"). Latson contends that he was denied proper medical treatment for these conditions and subjected to abuse, lack of due process, and retaliation during his eight months of incarceration at the Marion Correctional Treatment Center ("MCTC"), a VDOC facility, prior to his conditional pardon by the Governor of Virginia in 2015. He asserts claims based on the First, Eighth, and Fourteenth Amendments to the Constitution pursuant to 42 U.S.C. § 1983, as well as under the Americans with Disabilities Act ("ADA")

and the Rehabilitation Act ("RA").  The present defendants are VDOC; Harold W. Clarke, Director of VDOC; and Larry Jarvis and Dara Watson (née Robichaux), the former Warden and Assistant Warden, respectively, of MCTC.  The ADA and RA claims are brought against VDOC; the § 1983 claims are brought against the individual defendants. Latson seeks both compensatory and punitive damages from the defendants.[1]

After extensive discovery, the defendants jointly filed a Motion for Summary Judgment, which has been briefed by the parties and orally argued and is ripe for decision.  The parties have submitted a voluminous summary judgment record relating to Latson's confinement at MCTC, including depositions, affidavits and declarations, experts' evaluations and reports, and various official and unofficial records and correspondence.  Together the parties have filed nearly 3,000 pages of briefs and exhibits in support or opposition to the Motion for

---

[1]     Latson's case was initially filed in the United States District Court for the Eastern District of Virginia, and concerned his treatment both at MCTC, located in this judicial district, and during a prior confinement at the Rappahannock Regional Jail, located in the Eastern District.  The claims against the present defendants concerning MCTC were severed and transferred to this court.   Mem. Op. & Order 16-17, *Latson v. Clarke*, No. 1:16-cv-00447-GBL-MSN (E.D. Va. Oct. 14, 2016) (filed in this case at ECF No. 79).   The remaining Eastern District claims were thereafter settled and that case dismissed.  After the transfer, Latson filed an Amended Complaint in this court.

Summary Judgment.[2]   The court has also considered oral argument by counsel, which lasted nearly two and a half hours.

Among other arguments, the defendants contend that Latson's claims under the ADA and the RA are barred by the statute of limitations and that the individual defendants are entitled to qualified immunity.  I agree and will grant the Motion for Summary Judgment.

## I.

The following facts taken from the summary judgment record are either undisputed or, where disputed, are presented in the light most favorable to the plaintiff as the nonmoving party.[3]

Latson was diagnosed with ASD and ID as a child.  As a result of these disabilities, he has poor eye contact and social skills, poor auditory and reading comprehension, and he mumbles and is difficult to understand.  He does not like to be touched and has a heightened fight-or-flight response, often becoming physically combative when frustrated.  His coping skills and executive functioning

---

[2]   The referenced pages do not include the briefs and exhibits filed separately in support and opposition to motions for exclusion of expert witnesses, which motions bore some relation to consideration of the Motion for Summary Judgment.  Those briefs and exhibits add several hundred more pages to the total.

[3]   The following statement of facts recites certain information contained in exhibits that were filed under seal.  I find that the quoted portions of these exhibits are not sensitive in light of the non-sealed allegations made in the Amended Complaint and the parties' briefs.

are limited.  In addition to ASD and ID, Latson has also been diagnosed with co-morbid conditions of depression and anxiety, which often accompany ASD.

As a result of his disabilities, Latson often does not respond well to authority figures and has a history of troubled interactions with law enforcement, which on several occasions have led to criminal convictions and incarceration.  He was previously incarcerated at Powhatan Correctional Center ("Powhatan"), a VDOC facility, in 2011 and 2012.  Jeena Porterfield oversaw Latson's treatment there. According to Porterfield, Latson's ASD would be obvious within five minutes of talking to him.  Powhatan staff were instructed to verbally advise Latson before touching him for any reason and were educated that his lack of eye contact did not indicate that he was lying.  While at Powhatan, Latson was offered recreation daily.  Latson's mother frequently communicated with Powhatan staff about Latson, advocating on his behalf and often complaining about his treatment. However, according to Porterfield, Latson did not have problems with security staff at Powhatan.  Latson was generally satisfied with his time at Powhatan, and at oral argument in this case, his counsel pointed to his treatment there as an example of how MCTC should have handled Latson.

On March 7, 2014, Latson was sentenced in Frederick County, Virginia, Circuit Court for attempting to disarm a law enforcement officer and assaulting a law enforcement officer.  On March 20, 2014, he was sentenced in Stafford

County, Virginia, Circuit Court for assault on a law enforcement officer. These felony convictions and sentences led to his incarceration, first at Northwestern Regional Adult Detention Center ("NRADC") and then at Rappahannock Regional Jail ("Rappahannock"), where he was transferred on April 21, 2014. Neither NRADC nor Rappahannock is a VDOC facility. Rappahannock is a local jail operated by a local jail authority.

When he arrived at Rappahannock, Latson was immediately placed in segregation. The administrative segregation cell in which Latson was housed at Rappahannock had a mattress on a ledge, a toilet, and a sink. It had no window, only a flap in the door that was generally kept closed. Latson was allowed to keep his toiletries, commissary items, radio, books, and other personal property in his cell at first. Three days after his arrival, however, Latson was moved to a crisis cell, which contained nothing but a hole in the floor to be used as a toilet and a safety mattress. He was not allowed to keep toiletries or any other personal property in that cell.

Latson was moved to the crisis cell because a psychiatrist evaluated him, found him to be suicidal, and directed that he be put on full suicide watch. As he was being placed into the crisis cell and his clothing removed, he was pushed against the wall and told to put his hands on the wall. When his handcuffs were removed, he turned and struck an officer three times in the temple, ear, and face.

Another officer used a Taser on Latson and placed him in handcuffs and leg irons. A nurse saw Latson and removed the Taser probes. Latson was then placed in a restraint chair with his arms, legs, and chest strapped to the chair. He was left in the chair for almost nine hours, which is longer than allowed under the applicable policy without authorization from command staff. Latson was criminally charged with assault and pled guilty, and he received an additional six-month sentence. About a week after this incident, Latson was moved from the crisis cell to administrative segregation, where he remained for the duration of his time at Rappahannock.

There is no evidence in the record that defendants Clarke, Jarvis, or Watson learned of this incident at Rappahannock prior to Latson's later transfer to MCTC. At some point, an attorney for Latson, Lisa Greenman, called Director Clarke and told him that conditions at Rappahannock were not good and that Latson was defecating in a hole in the floor of his cell. She asked for Latson to be moved to a VDOC facility because she believed that VDOC could better serve Latson's needs. Neither Clarke nor Greenman can recall the specifics of this conversation or the date on which it occurred. Clarke did not speak to MCTC Warden Jarvis about Latson. He asked Assistant Warden Watson for information about Latson, but he does not recall when he made the request or what prompted it. Greenman had also been contacting Keith Dawkins, a high level VDOC official, regularly with

concerns about conditions at Rappahannock, but the timing and content of those conversations is not in the record.

As Director of VDOC, Clarke has discretion about which inmates to bring from regional jails to state facilities. In making that determination, he considers bed availability and date of final sentencing order. By statute, a person sentenced to more than a year of incarceration is to be received into VDOC custody "within sixty days of the date on which the final sentencing order is mailed by certified letter or sent by electronic transmission to the Director by the clerk." Va. Code Ann. § 53.1-20(B). There is a conflict in the evidence as to when VDOC considers an inmate to be "VDOC-responsible" or "state-responsible," although that issue is not of critical importance. Because Latson had been convicted of felonies and sentenced to more than a year of incarceration, Clarke had the power to transfer him from Rappahannock to a VDOC facility, which he ultimately did. Latson spent approximately six weeks at Rappahannock and was transferred to MCTC on June 5, 2014.

Attorney Greenman's advocacy led Clarke to accept Latson into a VDOC facility more quickly than would otherwise have been expected based on standard practice and bed availability. Once he made the decision to transfer Latson to MCTC, Clarke received updates regarding the status of Latson's arrival there.

On June 4, 2014, the day before Latson's arrival at MCTC, VDOC psychologist Eric Madsen wrote in an email to Jarvis, Watson, and others that he had spoken with mental health staff at Rappahannock and a VDOC community psychologist had visited Latson at Rappahannock, and Latson had seemed to be doing well there, contrary to Greenman's accounts. It was Madsen's decision to place Latson at MCTC, a facility that focuses on mental health treatment. He took Latson's disabilities into account in a general way, but he did not specifically consider Latson's ASD and ID. Madsen did not believe special input from an autism expert was required when deciding on Latson's placement. He believed that MCTC was the best facility that VDOC had to offer Latson, and the mental health unit there could serve the needs of an inmate with ASD.

Upon Latson's arrival at MCTC, Christopher Armes, a psychology associate, assessed him as having a high risk of aggression based on his impulsiveness, poor insight, and limited coping skills, as well as his history of assaulting law enforcement and his experiences at Rappahannock. Armes reviewed thousands of pages of documents regarding Latson in preparation for Latson's transfer to MCTC. He had heard about Latson through emails and phone calls before Latson arrived at MCTC, and he and others also knew about Latson from newspapers and the internet. Most offenders are received into the VDOC system at a reception center where they go through an intake process, but Latson

was transferred directly from Rappahannock to MCTC and skipped the usual reception process, so it took the MCTC staff longer than usual to complete their assessment and other intake tasks. Recreational therapy supervisor Mark Guerry conducted a Recreation Therapy Assessment and planned for himself or another recreational therapist, Helen Fuqua, to meet with Latson one-on-one approximately three times per week to provide him recreational and therapeutic activities that matched his interests and abilities.

In a mental health appraisal dated November 4, 2014, Armes wrote that Latson has "Autism Spectrum Disorder, requiring support for deficits in social communication and for restricted repetitive behavior with accompanying intellectual impairment; and requiring support for some deficits in to-and-from conversation with accompanying language impairment." Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. Y, Mental Health Appraisal 5, ECF No. 202-29. "Mr. Latson's significant adjustment difficulties are considered to be a reflection of his Autism Spectrum Disorder, his limited intelligence, a limited socialization history and associated limitations of judgment and impulse control." *Id.* at 6. "He has significant social connectedness deficits which could lead to conflictual social interactions and aggression when Mr. Latson misunderstands the social context of the contact." *Id.*

Latson was confined in special housing — segregation — for the majority of his time at MCTC. His housing status varied — sometimes it was listed as administrative segregation, and other times it was listed as general detention, pre-hearing detention, or disciplinary segregation — but these are all considered forms of special housing and all use the same cells. The changes in housing status affected the privileges he was afforded vis-à-vis personal property, commissary access, phone calls, and out-of-cell time, but not his actual location. The plaintiff refers to all of these special housing statuses as solitary confinement, but because that term is imprecise and somewhat misleading, I will refer to them collectively as restrictive housing.

Immediately upon his arrival at MCTC, Latson was placed in restrictive housing with a general detention status, purportedly to allow the staff to assess him and decide on an appropriate housing status. Although the applicable policy states that he should only have been in general detention status for three days, he was classified as general detention for six days.[4] His status was then changed to administrative segregation for 30 days, pre-hearing detention for four days, administrative segregation for six days, disciplinary segregation for nine days, and

_____

[4] There is some indication in the record that Latson may have been kept in general detention status for as long as 15 days before being reclassified as administrative segregation, but this dispute of fact is not material for purposes of the summary judgment motion.

administrative segregation for 55 days before he was placed in general population. This initial period in restrictive housing lasted from June 5, 2014, through September 22, 2014, for about three and a half months.

Latson then spent 12 days in general population before being returned to pre-hearing detention on October 5, 2014, remaining in that status for 14 days. His status was changed to general detention for two days and then to administrative segregation for 52 days. This second round of restrictive housing lasted about nine and a half weeks. Latson was then placed into general population again and spent 39 days there, from December 12, 2014, through January 19, 2015. Upon being conditionally pardoned by the Governor, he was returned to general detention status for four days. He was then placed in general population status and moved to his own wing of the prison for 11 days while he awaited transportation from MCTC to a private residential treatment facility in Florida, a condition of his pardon. He departed MCTC on February 2, 2015. In total, Latson spent 182 days in restrictive housing at MCTC and 62 days in general population.

Latson had some form of human interaction every day while he was in restrictive housing, although on a few days his only human contact was with a nurse through a slot in his cell door several times throughout the day. He was offered some form of out-of-cell recreation on most weekdays, although he did not always accept it. He was given the opportunity to shower at least once a week and

at times every other day or every day, and he usually accepted the chance to shower, leaving his cell to do so. He spoke with either his mother or his attorney by phone most days while he was in restrictive housing, although several days would sometimes pass between phone calls. At one point, he may have gone as long as 12 days without a phone call, but he may have spoken with his attorney from his counselor's office during that time. Latson often used the counselor's office phone, and those calls were not logged. Latson testified that when he was in segregation, he was not permitted to make "privilege phone calls" until he had been there for 30 days. Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. D, Latson Dep. 112-13, ECF No. 202-7.

In addition to daily nurse visits, he was visited by a member of his treatment team on at least 35 days while he was in restrictive housing. These visits were more frequent early in his incarceration at MCTC and slowed considerably as time went on. There were stretches of time when Latson went 11, 13, 20, and as long as 26 days without being visited by a member of his treatment team or by psychologist Ann Horst, nurse Tammy Jones, or Nurse Hall, although he did meet with recreational therapists at times during these periods, and nursing staff continued to check on him through his cell door several times per day.[5] Other

_____

[5] The record contains conflicting evidence regarding how often Latson was visited by members of the treatment team; he may have been visited as often as every day. It

routine but infrequent interactions included occasional cell cleanings, delivery of mail, and haircuts. Latson sometimes went 48 hours or longer without being given the opportunity to leave his cell. At one point he refused recreation for several days and spent four consecutive days in his cell. In July and August, 2014, Latson declined recreation opportunities for a period of three and a half weeks, leaving his cell only for showers, a court hearing, a couple of phone calls, and a handful of medical appointments and treatment team meetings.

Latson testified that he refused recreation because he did not want to interact with the guards or cause any problems with them. He also sometimes refused to go outside because it was cold. During recreation, a guard would remove Latson from his cell and take him to an outdoor cage. There was nothing in the cage; it was simply a fenced outdoor space where he could do exercises like pushups. He would be the only inmate in his cage, although other inmates might be in their own cages. Latson did not want to interact with other inmates, who would call him over to talk to them, asking him questions and looking at him in ways that made him uncomfortable.

---

appears that the nurses who checked on Latson daily and dispensed his medication through his cell door were not considered to be part of the treatment team. Additionally, there are days on which records simultaneously state that Latson interacted with a recreational therapist but that he was not visited by a treatment team member, which suggests that the recreational therapists were not considered part of the treatment team either.

Latson was prescribed and administered medication beginning on June 7, 2014, his third day at MCTC.  Aside from two days on which he was not given medication and one day on which he partially refused it, Latson took medication every day from June 7, 2014, through February 1, 2015, his final full day at MCTC.  To facilitate weight gain, he was given Ensure from June 16, 2014, through August 14, 2014, and again from August 25, 2014, through February 2, 2015, with the exception of January 25, 2015.  Nurse Jones prescribed Ensure because Latson's body mass index was at the low end of the normal range.  There was a period of ten days during which, for no known reason, Latson was not provided Ensure.

When Latson was in disciplinary segregation, he was not permitted to have any books in his cell other than a religious text.  When he was in other housing statuses, he at times had books in his cell.  A radio played in the hallway outside his cell.  While in disciplinary segregation, Latson's hygiene materials were kept outside his cell for security reasons, although his toilet paper remained in his cell.  Latson usually did not ask for his hygiene items when he needed them because he was afraid of the guards.

MCTC implements Segregation Release Plans ("SRPs") to allow inmates in segregation to socialize with other offenders.  During his time at MCTC, Latson had a series of SRPs, which were designed by Armes, reviewed by Watson, and

approved by Jarvis.  The SRPs provided that Latson could spend a certain amount of time per day, on a certain number of days per week, outside of his cell, usually in the day room on another wing or in the gym.  While in the day room, he could make phone calls, watch television, play games, or otherwise interact with other inmates.  When he was in the gym, he could not watch television or use the phone, but he could walk, play basketball, use an exercise bike, or do other physical activities, or he could choose to simply sit in the gym and do nothing.  Whenever he had the opportunity to use the telephone, Latson usually called his mother or his attorney rather than partaking in other activities.

Latson's first SRP became effective on June 27, 2014, and provided for one hour per day, three days per week of out-of-cell time.  During his first SRP, Armes or social worker Gary Lyons sat with Latson while he was out of his cell to ensure he was safe and socializing appropriately.  Armes had not done this with other offenders.  Latson's first SRP was in place for four days when Latson had an outburst and threw toiletry bottles against his cell door and water under his cell door.  As a result of this incident, his SRP was terminated.  An SRP was again implemented seven days later, on July 7, 2014, which provided for 30 minutes to one hour of out-of-cell time three days per week.  That SRP remained in place for four days.

On July 11, 2014, Latson had another behavioral outburst and his SRP was suspended. He pushed his meal tray through the tray slot in his cell door, hitting a guard, and then refused to return his rubber cup. Latson has testified that he had intended to hit the guard with the tray. The guards handcuffed him to retrieve the cup, and while they were removing the handcuffs through the tray slot, they twisted and pulled his arm, he pulled away, and he sustained a laceration to his arm. He received sutures. According to Latson, blood from this incident remained in his cell for an extended period of time.

After the incident, Armes conducted an Offender Mental Health Assessment and "determined that Latson was mentally capable of being held responsible for the offense, that his mental disorders did not impair his understanding of the penalty offer that was made to him, that he was capable of effectively participating in the hearing, and that disciplinary segregation would not be detrimental to Latson's condition." Mem. Supp. Defs.' Mot. Summ. J. Ex. 33, Armes Aff. ¶ 1, ECF No. 182-34. Sarah Angliker, the chief social worker at MCTC, testified that the treatment team agreed with the decision to charge Latson with simple assault because they believed Latson knew what he was doing and knew it was wrong, but threw the tray in anger.

As a result of the July 11 offense, an Institutional Classification Authority Hearing ("ICA Hearing") was held on July 21. During an ICA Hearing, a multi-

disciplinary team is present, and everyone offers recommendations for the offender. An Institutional Classification Authority ("ICA") is a person who makes sure that the hearing is fair, correct, and sound. Assistant Warden Watson was designated to serve as the ICA.

To satisfy due process requirements for offenders in segregation, the inmate has to be served with paperwork in a timely manner and to know why he is there. Latson was served with the relevant paperwork for the July 21 hearing. The warden generally does not attend ICA Hearings, but the warden approves all recommendations, and in his absence, the assistant warden approves them. Latson pled guilty and accepted a penalty offer of 20 days of disciplinary segregation for his conduct on July 11.

Latson's next SRP took effect on August 8, 2014, and provided for 30 minutes to one hour of out-of-cell time at least three days per week. After seven days, his SRP was changed to provide for up to one hour of out-of-cell time at least five days per week. A new SRP form was completed on August 21, 2018, providing that on three out of the five days, Latson's out-of-cell hour would be spent in the gym during residential recreation time, while on the other two days, he would spend his out-of-cell time on wing 2B, where he had previously been going for SRP time. Wing 2B was a more controlled environment than other residential general population wings. This plan continued for several weeks until September

10, 2014, when his out-of-cell time was increased to up to two hours per day, five days per week, and the location was changed to wing 1D, a residential wing. This SRP was in place until Latson was moved to general population on September 23, 2014.

On October 5, 2014, Latson spat on an officer and was placed back in restrictive housing. He was not otherwise disciplined for the incident, but no new SRP was implemented for about seven weeks. Armes again conducted a mental health assessment and "determined that Latson was mentally capable of being held responsible for the offense, that his mental health disorders did not impair his understanding of the penalty offer that was made to him, that he was capable of effectively participating in the hearing, and that disciplinary segregation would not be detrimental to Latson's condition." Armes Aff. ¶ 12-13.

On November 21, 2014, a new SRP went into effect providing for one hour per day, five days per week to be spent on wing 2B. Two weeks later, the SRP was changed to allow for one hour per day on wing 1D in the morning and two hours in the evening, provided staff was available. This SRP remained in place until Latson was again moved to general population on wing 1D on December 12, 2014.

Armes testified that he did not want to overwhelm or overstimulate Latson, which is why he increased Latson's SRP time so slowly and why Latson initially spent time on wing 2B before going to wing 1D. There were fewer inmates in the

gym than in the day rooms on the wings, so having Latson spend some of his time in the gym was also intended to ease him into socializing without overwhelming him. The goal of the SRPs was to eventually place Latson in general population. Latson was given more out-of-cell time than other offenders with serious mental health diagnoses. According to Armes, most offenders in segregation at the time were only granted one hour per day, three days per week of out-of-cell time, although the applicable policy stated that the typical frequency would be at least one hour per day, five days per week.

Julie Carpenter, Latson's former attorney, visited him on October 3, 2014, while he was in general population. Latson asked for her help in completing a grievance form, and she asked for permission to help him, but Watson and others refused to let Carpenter assist in completing or submitting the grievance. Prison staff told Carpenter that Latson had to either complete the form in his own hand or request help from a staff member. Latson was unable to complete the form himself due to his disabilities, so he did not file a grievance.

Latson's treatment team at MCTC was comprised of medical and mental health professionals, including those with expertise in psychology, psychiatry, and nursing, but they collectively had very little training or experience in working with persons with ASD. Angliker was the chief social worker and coordinator of the entire residential program at MCTC, and she supervised all the offenders and their

treatment teams. She did not have any formal training specific to ASD. Angliker does not recall having any other inmates with ASD at MCTC before Latson. She did some internet research on Aspberger's syndrome and shared the information she found with the treatment team.

Lyons was the residential social worker assigned to Latson, and he was supervised by Angliker. Lyons was the case coordinator for Latson. He had no training specific to ASD.

Latson's team nurse was originally Lynn Rector and later changed to Jeffrey McGrady. Neither of them had training or experience in working with persons with ASD. Dr. Horst was the supervising psychologist and prescribed psychotropic medications. She was sometimes on site at MCTC and sometimes did telepsychiatry, talking to inmates over video conferencing. She had some experience treating autistic patients, although the extent of that experience appears to have been minimal.

Amanda McGrady, Ph.D., was a psychology supervisor at MCTC but was not really considered part of Latson's treatment team. She had previous experience working with children with autism under the age of 13 and with children and adults with intellectual disabilities. Armes, the psychology associate, did not receive any training at MCTC that was specific to working with people with ASD or ID and had no previous experience working with people with ASD. He did, however,

complete annual training that covered the treatment of mentally disabled inmates, and he teaches classes on management of offenders with mental illness and suicidal tendencies, which are attended by all staff.

Clarke, the VDOC Director, was not personally involved in any decisions regarding Latson's care and treatment, including housing or disciplinary decisions. Clarke did not receive regular updates on Latson while he was housed at MCTC.

Jarvis was the Warden at MCTC until December 31, 2014. Although he was sometimes involved in discussions regarding Latson's treatment, he was not qualified to provide medical or mental health treatment and was not involved in determining what treatment was appropriate for any offender. Jarvis discussed Latson with his supervisors but does not recall the specifics of those conversations other than "we want to make sure we do what we need to do, because of all the attention that is focused on him, that we were in compliance with the law, and policy, and anything that relates to it." Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. II, Jarvis Dep. 70-71, ECF No. 202-39.

Jarvis trusted the mental health professionals to determine whether an inmate's behavior was related to his disability. His first concern was for security and safety. His goal was to get inmates into general population as soon as he could. VDOC's strategy in recent years has been to reduce the use of segregation. Jarvis testified in his deposition, "I am aware that long-term segregation is not a

healthy situation. But you have to weigh that against the potential for safety and violence, not being in segregation." *Id.* at 268.

Watson, the Assistant Warden and later Warden of MCTC, has had some training on working with individuals with ASD and ID, but she is not qualified to provide medical or mental health treatment. Watson had daily communication with Registered Nurse Coordinator Ella Davidson, Angliker, and Dr. McGrady. Watson frequently communicated with Jarvis about Latson. Watson and other wardens have been trained regarding the effects of isolation, and they are trying to minimize the use of segregation.

In his deposition, Latson testified that officers at MCTC had pushed him all the time. They also taunted him and accused him of faking his disabilities. Dr. McGrady admitted that there were some questions about Latson's ASD diagnosis because his IQ, though below average, was higher than might be expected for a person with ASD. Latson described an incident when Officer Croner, who was taking Latson to the shower area, had asked Latson if he wanted to run his mouth and had used a racial expletive. Latson Dep. 156, ECF No. 202-7. While he was in the shower, Latson told the officers, "Fuck you" because they were "taunting [him] and tormenting [him]." *Id.* He spat on Officer Hess. *Id.* at 157. Hess told Latson he thought Latson did not actually have autism and was faking it. *Id.*

On one occasion, Latson went to the chow hall and was looking for his friend, but Officer Hess told him to sit in a particular place. He did not want to sit there but he did as he was told. When Latson was walking back to his wing, he bumped into Hess. He was tired and was trying to avoid eye contact with Hess, and he accidentally brushed Hess's side. Latson apologized, and Hess said, "It might help if you open up your eyes and stop acting like there's something wrong with you." Mem. Supp. Defs.' Mot. for Summ. J. Ex. 11, Latson Dep. 153, ECF No. 182-12. Latson responded that it was cold and he was tired, and Hess told him to keep walking. Latson then said some other unspecified things, and Hess asked if he wanted to go back to wing 1B. Latson directed an expletive at Hess, and Hess then handcuffed Latson. Hess told Latson to put his hands behind his back, which Latson did, and then Hess used his knee to hold Latson up in the air and threatened to "stomp the dog shit out of" Latson. *Id.* at 155. Then several other officers came, and they all started pushing Latson back to segregation. Latson testified that he had been fully compliant and had not resisted the officers' efforts to guide him in the direction they wanted him to go. Latson also described another incident in which he had sworn at Hess.

Latson described his first cell at MCTC as small, with a toilet and a cement ledge with a comforter on top of it for a bed. The cell had a sink, and there was a window in the door. There was no window to the outdoors, and there was no

clock. When Latson arrived, there was toilet paper in the cell. When he ran out, he did not ask for more because he was scared of the guards. He thought they would get angry and yell or cuss at him. At some point, Latson did not have a toothbrush, though he does not know what happened to it. He did not ask anyone about his toothbrush. He told his mother it was missing, she called prison officials, and he then received another toothbrush. Sometimes officers at MCTC would give Latson hygiene packages, which included toilet paper, a toothbrush, and toothpaste, among other things. Latson could not recall how often he received these packages.

Sometimes Latson would leave his cell to meet with his treatment team, but he does not remember how often he met with them. At one point, Latson had a popular magazine in his cell. He does not remember whether he had other books or whether he accessed the library. At times he purchased things from the commissary, including food items like chips. Attorney Greenman subscribed to some magazines for Latson.

Armes testified that Latson usually became agitated after talking to his mother on the phone. When the treatment team was around, they would work with Latson to de-escalate the situation. Armes would remind the team not to make eye contact with Latson. Armes told the treatment team that their uniforms alone could trigger Latson.

Latson's care manager, Lyons, was required to have one-on-one meetings with Latson.  Armes sometimes met with Latson outside of Latson's cell, in a conference room.  Latson directed the conversations but often did not talk much.  Often Armes and Latson would watch television or he would talk with his mother or lawyer on the phone during meetings with Armes.  These meetings would last an hour or less.

Recreational therapist Guerry suggested a points-based rewards system for Latson, but Latson thought it was childish and did not want to participate.  Guerry implemented the use of stickers in keeping Latson's daily log while he was housed in wing 2B.  Guerry initially met with Latson in the day room to complete the daily log forms, but he eventually began giving Latson the forms to complete on his own in his cell.  Latson stopped completing the forms, stating that they were not helping him.  Guerry spent more time on Latson than other offenders, both in one-on-one meetings and treatment team meetings.  When Latson did not want to participate in group activities, Guerry would leave coloring pages or other materials for him to complete in his cell.  Guerry invited Latson to play volleyball several times, but Latson always declined.  He also declined to participate in other activities like basketball.

Watson testified that inmates who receive conditional pardons are placed in segregation for their protection to prevent other inmates from harming them.  After

he was conditionally pardoned, Latson was placed in general detention status and moved to a segregation cell for several days until Watson secured an empty wing for him, wing 2C. While in general detention status, his privileges were limited and his personal property was taken from him. He did not initially have access to books, although he was eventually given books and magazines. While on wing 2C following his pardon, an officer was present with Latson around the clock. Latson had access to books, puzzles, a television, and a telephone. Guards reviewed his commissary list with him, and he was able to shower. He had a music player. He was required to be in his cell two times per day, but otherwise he could leave his cell freely to watch television or make phone calls in the day room. He was allowed to leave the wing for recreation.

Throughout Latson's time at MCTC, attorney Greenman frequently emailed and called staff expressing concerns about conditions and events as Latson had described them to her. She explained that Latson struggled to identify his needs and had difficulty asking guards for things. In her communications with MCTC staff, she asked about the SRPs, requested that they consult with a sister Virginia agency about how to work with people with ASD, asked what Latson could access, and expressed concern about his weight loss and how being in isolation would affect his mental health. Greenman connected MCTC staff with Barry Seaver of the Virginia Department of Behavioral Health and Disability Services, who was

willing to assist MCTC with Latson's treatment, but MCTC staff did not follow up on that offer. Greenman visited Latson at least once while he was at MCTC, on August 5, 2014. She ordered books and magazines for him and repeatedly asked for him to be provided greater stimulation, specifically requesting that he be given a television or radio. Watson and Dawkins joked about that request, with Watson writing, "She is asking for a bit much." Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. RRR, ECF No. 202-74.

MCTC staff were contacted and visited by outside investigators with the Virginia Attorney General's Office and the Disability Law Center of Virginia concerning Latson during his incarceration. They gathered and produced documentation and kept detailed daily reports on Latson's treatment and behavior. Watson in particular was well aware that MCTC was under intense scrutiny regarding its treatment of Latson.

Denise Malone, VDOC's chief psychologist, received emails from Greenman and communicated with the treatment team and others about Latson. On October 27, 2014, Malone wrote to the treatment team and other MCTC staff:

> Per Eric Madsen, you folks at MCTC have done a really good job with reasonable accommodations. So my questions would be this . . . would we be willing to have the ADA folks tour MCTC? Can we invite them to provide a free training on Autism Spectrum Disorder? I don't expect us to be experts on this . . . it occurs very infrequently among our offenders.

*Id*. at Ex. FFFF, ECF No. 202-88. Dr. McGrady replied:

> Mr. Jarvis opposes the idea of the ADA coming for a tour, or to provide training for staff. He feels that staff at MCTC have provided the best care possible for Mr. Latson. I am in support of this opinion. I actually feel that Mr. Latson has demonstrated improvement in some areas while here.

*Id.* Malone responded, "I'm not disagreeing with you both, but we need to cover all bases. Is there anyone on your staff with documented experience & training in working with Autism Spectrum Disorder? If so, is that person seeing Latson?" *Id.* Dr. McGrady replied:

> I would probably be the only person with experience seeing anyone with Autism Spectrum Disorder, although mostly I saw children and teens diagnosed with it. I am not meeting with Mr. Latson, although I do see him on morning rounds every day. I am supervising Chris [Armes] who sees him, however.

*Id.*

On November 24, 2014, Malone emailed Lyons, Armes, Dr. McGrady, and others with "a few notes to capture what we discussed Friday morning, for your consideration to include in treatment plan." *Id.* at Ex. RRRR, ECF No. 202-100. One of the things she suggested was to "[p]rovide more written materials the offender can keep in his cell, such as on numerology, stars, Beyonce, and other favorite topics. Also might provide more materials as reinforcement." *Id.* Other suggestions included "[c]onsider a consultation from Jeena Porterfield, who knows the client well and had relatively good outcomes when he was in her unit," and

"[e]ngage educational mentors/tutors/teachers as offender seems motivated to learn." *Id.*

On December 10, 2014, Malone forwarded an email from Greenman to Dr. McGrady, Armes, Lyons, Watson, and others, instructing the treatment team to "continue to move forward clinically as you have determined would be beneficial. If as she suggests, showing advocate schedule would lead to her getting offender to engage, please consider doing so." *Id.* at Ex. TTT, ECF No. 202-76.

Psychologist Horst testified in her deposition that it would have been better for Latson to have had books or playing cards or other stimuli in his possession. She noted, however, that "this is a security driven institution and it was not within my purview to be able to order any of this. I could order it if I wanted to order it all day long. I could write down the order, it would not have been followed." *Id.* at Ex. CCC, Horst Dep. 74, ECF No. 202-59.

On December 23, 2014, as part of a U.S. Department of Justice investigation, Johannes Rojahn, Ph.D., visited MCTC. Dr. Rojahn is a psychologist with expertise in ID and ASD. He issued a report dated February 16, 2015. Dr. Rojahn wrote that Latson's "difficulty with executive functioning becomes aggravated in stressful and anxiety-evoking situations, which are the ones in which he sometimes resorts to outbursts." *Id.* at Ex. EEE, Rojahn Report 2, ECF No. 202-61. He stated that "while not a core symptom, aggressive behavior is

highly prevalent in individuals with ASD, as well as in individuals with intellectual disabilities." *Id.* People with ASD often have "unusual reactions to sensory input, such as noises or being touched. This fits with the observation of Mr. Latson's aversion and frequent angry outbursts when being physically searched." *Id.*

When Dr. Rojahn interviewed Latson, Latson said he did not trust other inmates and preferred to keep to himself. In Dr. Rojahn's opinion, "the step-down stages of the SRPs are too long and slow-paced for Mr. Latson, thus compromising the effectiveness of the treatment plan." *Id.* at 4. "[O]fficers administering the disciplinary procedures are likely to turn into adversaries for Mr. Latson, further fueling his feelings of anger and hostility towards them, and setting off a negative spiral of increasing aggressive behavior." *Id.* Dr. Rojahn wrote that "[t]he existing MCTC disciplinary action with segregation and SRPs, in my opinion, is bound not only to fail to improve Mr. Latson's behavior but to deteriorate it." *Id.*

Dr. Rojahn further advised as follows:

A token system with clearly defined behaviors and consequences can, in principle, be a very reasonable and powerful element in a behavioral treatment plan in as much as it can give Mr. Latson control over his behavior over short time periods, which helps him . . . bridge the long time required to stay out of trouble. The main problem [with the system being used by MCTC] is that there are no 'backup-reinforcers' (e.g., a can of Coke from the commissary, a phone call to his mom, a picture of his family, access to TV in his cell) available to Mr. Latson for earned stickers (tokens). Although Mr. Latson may appreciate the social acknowledgement by the therapist when a sticker is dispensed, it is unlikely that those tokens will have a lasting

reinforcing effect in helping Mr. Latson to suppress anger outbursts when the occasion arises.

*Id.* at 5. Dr. Rojahn noted that the treatment team had not done a functional assessment of Latson's behavior challenges. "Functional assessment is a necessary step in behavior programs that are designed to decelerate or eliminate behavior problems." *Id.*

Dr. Rojahn gave the following description of the physical environment in which Latson was living:

> The environment at MCTC is harsh, barren, and forbidding. Even Mr. Latson's general population cell is cold and empty, with a narrow cot covered with a thin blanket without a pillow, beige tiles covering the walls, terracotta floor, a large but grimy barred window, and a metal toilet and water fountain unit. The iron door has a ceiling light (a bright light and a dimmed light) and toilet flushing are [sic] controlled from outside the cell. The physical characteristics of the 'general population' space is [sic] not much more inviting. Stale odor from antiseptic solutions everywhere. One TV set high up in a corner, heavy square wood furniture with plastic covers. Units also have a 'porch,' which has a concrete floor, a few windows, some chairs and a picnic table. For outside recreation there is a 15' x 25' fenced-in, empty cage available. In other words, together with the inflexible MCTC disciplinary protocol, it is an atmosphere ill equipped for psychological and behavioral treatment.

*Id.* Dr. Rojahn recommended that a community living facility would be a much better option for Latson.

Eldon Vail, an expert in prison administration, opines that "MCTC failed to keep a person with known disabilities such as those described for Mr. Latson safe

from significant risk of serious harm." *Id*. at Ex. L, Vail Report 5, ECF No. 202-16. Vail further opines that "Latson did not receive appropriate mental health treatment" at MCTC. *Id.* at 6. Moreover, his "segregation was unreasonably punitive, contrary to well-established standards for such segregation and was, in fact, contrary to good prison security." *Id.* Vail describes MCTC as "out of step with current standards and the research for the treatment of individuals with disabilities such as Mr. Latson's within the correctional environment." *Id.* at 7.

Vail says that the defendants should not have placed Latson immediately into restrictive housing because doing so was likely "to increase his risk for deterioration and self-harm and in the long run make him a greater danger to others." *Id.* at 10. Vail characterizes Latson's occasional refusal of recreation as showing "a lack of reward or stimulation Mr. Latson experienced when he did elect to go out to recreation." *Id.* at 14-15. According to Vail, the treatment plan for Latson was weak and not really feasible when most interactions occurred through a cell door while Latson was in restrictive housing. *Id.* Vail writes that "with appropriate treatment and intervention, Mr. Latson's risk for aggression should decrease, making his time spent while incarcerated safer both for him and those with whom he would come into contact." *Id.* at 20.

In his deposition, Vail explained that many states have tried to get mentally ill inmates out of segregation because "[t]hey don't conform as rational actors to

the rules of the prison, and so they often times wind up in trouble," and "that exacerbates their underlying mental illness." *Id*. at Ex. M, Vail Dep. 65, ECF No. 202-17. Mentally ill inmates "need to be out of their cell, either engaged directly into treatment activities or environments that allow them to practice what they are learning in those treatment environments," which could be "as simple as a structured social interaction with other prisoners." *Id.* at 69. "The ratio of support versus punishment or discipline should be much greater to manage somebody like Mr. Latson. He's got to feel like he connected to someone who is there to help him." *Id.* at 79. A person with a developmental disability "should be placed in segregation when it needs to happen for their safety and for other people's safety, but the duration of that confinement should be determined based on their treatment needs." *Id.* at 86.

Louis J. Kraus, M.D., is an expert in child and adolescent psychiatry, including in residential treatment and correctional facilities. Dr. Kraus met with Latson twice and diagnosed him with ASD, recurrent major depression, PTSD, and generalized anxiety disorder. Depression and anxiety are separate and distinct diagnoses from ASD and are episodic. "One of the most common episodic reasons that patients with an Autistic Spectrum Disorder become agitated is because of worsening anxiety. Mr. Latson's coping strategies and executive functioning are quite poor. In particular in situations of acute anxiety he will act out in an agitated

and sometimes violent way." *Id*. at Ex. Q, Kraus Report 29, ECF No. 202-21. Dr. Kraus notes that "there was an intermittent component to Mr. Latson's behavior." *Id.* at 17. "There were episodic periods of time where Mr. Latson would become agitated. There were episodic periods of time where his anxiety was worsened and there are episodic periods of time where his depression was worsened." *Id.* at 18. The fact that he was at times suicidal "shows the episodic history that Mr. Latson has regarding major depressive and anxiety symptoms, in association with the chronicity of his pervasive developmental disorder/his autistic spectrum diagnosis." *Id.* at 20.

Dr. Kraus states that Latson's SRPs did not take into account the impact of segregation on a person with ASD. He opines that the system of using stickers as rewards or reinforcements "likely had limited therapeutic value." *Id.* at 24. According to Dr. Kraus, MCTC's "rigid positive behavioral plan, was unlikely to have any significant therapeutic value to an individual with autism such as [Latson]." *Id.* at 29. MCTC staff should have "had consults on how to appropriately treat and intervene" with Latson. *Id.* at 30.

Dr. Kraus opines that Latson's psychiatric care was substandard in that he was not prescribed appropriate medications. *Id.* In addition, "[b]ehavioral plans for adults need to be more variable and there needs to be an attempt in following through on what is effective and how to modify the behavioral plan when it is not

effective." *Id.* "[T]here were essentially no therapeutic interventions for Mr. Latson other than the almost unchanging medication management, while he was in segregation. The brief check-ins by mental health do not qualify as mental health treatment." *Id.* Dr. Kraus suggests that depriving Latson of his coping mechanisms like music and reading "is tantamount to not giving an asthmatic their inhaler when they are having an asthma attack." *Id.*

In Dr. Kraus's opinion, Latson's "reaction to staff in situations were directly related to his disabilities and how he was being treated." *Id.* at 31. "Extensive segregation, particularly with individuals with developmental delays (Autism), Intellectual Disabilities and Mental health diagnosis is damaging. It can lead to worsening anxiety and mood symptoms . . . ." *Id.* Dr. Kraus stated that "I think that there are interventions which would have and should have fallen under mental health that could have been implemented that could have . . . either, one, reduced the amount of time that he was in some form of solitary confinement or, two, at least had minimized symptomatology and struggles which [he] was having." Suppl. Br. Supp. Pl.'s Opp'n Mot. Summ. J. Ex. I, Kraus Dep. 194, ECF No. 240-10. Explaining what he believes should have been done, Dr. Kraus explained:

> You're treating the symptomatology associated with autism. You're treating the speech and language deficits. You're understanding that his ability to understand language is very simple. He understands simple – perhaps one, two levels of statements in a sentence. You have to be very direct and uncomplicated. He

misperceived nonverbal presentations. He is particularly sensitive to different types of confrontation, which he engenders intense anxiety and behavioral outbursts. He has a proclivity for significant anxiety and mood symptoms, depressive symptoms. All of which, for the most part, are really not being addressed.

*Id.* at 194-95.

Based on what I reviewed, there is a paucity of understanding of what to do with an autistic young adult that was having the areas of deficit and struggles that Mr. Latson had. There is essentially nothing in there that will show me that there was an understanding of how to work with him. And just like when you have a serious medical problem that goes beyond what the general practitioner, internist at the facility is capable of doing or handling – say an eye problem or an acute cardiac problem or something like that – you get a consult. You bring people in to the facility or send them out to be assessed to help.

*Id.* at 197. Dr. Kraus conceded, however, that "[t]here were interventions. Now, what those interventions were and how helpful, that's a different question. But there clearly is documentation of interventions and mental health talking to him." Defs.' Reply to Suppl. Br. Ex. 73, Kraus Dep. 167, ECF No. 242-3.

Peter Leone, Ph.D., is an expert on treatment of people with disabilities in institutional settings. Dr. Leone opines that "Mr. Latson's behavioral outbursts are a manifestation of his disabling condition." Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. NNNN, Leone Report 5, ECF No. 202-96. The SRPs for Latson "required him to avoid 'assaultiveness, aggressiveness, hostility, agitation, being argumentative' and non-compliance," which are manifestations of his disability and behaviors with which he had struggled for years. *Id.* at 7. According to Dr. Leone, "the actions of

the VDOC exacerbated Mr. Latson's behavior and have compounded his legal difficulties and his ability to successfully reenter the community following treatment or incarceration." *Id.* at 8. At his deposition, Dr. Leone testified that he does not believe MCTC staff were trained effectively because Latson was written up eight times at a specialized facility and was sent to disciplinary segregation a few weeks after arriving there. According to Dr. Leone, the things Latson was asked to do in the SRPs were not really appropriate for him because "his troubles are in part a manifestation of his behavior and instead of providing accommodations, they say, okay, we're going to lock you down." Suppl. Br. Pl.'s Opp'n Mot. Summ. J. Ex. H, Leone Dep. 120, ECF No. 240-9.

Nakia M. Hamlett is a psychologist with expertise in young adults with intellectual and psychiatric impairments. She opines that "reactive aggression is extremely common in individuals with Autism Spectrum disorders due to an array of functional communication and social skills deficits that they often experience." Pl.'s Opp'n Defs.' Mot. Summ. J. Ex. U, Hamlett Report 3, ECF No. 202-25. Because of his experiences at MCTC and Rappahannock, Latson "experienced a complete psychiatric breakdown such that he decompensated and became acutely psychotic for a period of time." *Id.* at 4. Hamlett says that Latson "will never fully recover from these experiences and may never be able to be the independent young

adult he hopes to be." *Id.* at 5. The cost of Latson's treatment and housing going forward is estimated to be from $100,000 to $300,000 per year. *Id.* at 6.

It is important to note that the plaintiff has relied in opposition to summary judgment on hearsay statements of attorney Greenman concerning Latson's conditions of confinement and treatment at MCTC, information that she learned from others and passed on to MCTC staff by email. Some of the information conveyed appears to have been told to Greenman by Latson, while the sources of other statements are unclear. Of course, the rules of evidence permit Greenman to testify to what she actually observed and as to statements made to her by the defendants or their agents. Additionally, hearsay statements contained in Greenman's emails can be considered to the extent that they provided notice of certain events or conditions to the defendants. They cannot, however, be considered for the truth of the matters asserted. Latson's own deposition has been submitted in the summary judgment record and has been considered by the court in determining the issues in this case. Greenman's hearsay statements have not.

"[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). The burden is on the proponent of summary judgment material to show its admissibility. Fed. R. Civ. P. 56(c)(1)(B) advisory committee's note to 2010 amendment. Counsel for Latson suggested in oral

argument, Tr. 54, ECF No. 237, that "[w]e recognize defendants are raising a hearsay argument with respect to those emails. There are contemporaneous recordings of conversations that she had with Mr. Latson. I think they come in under the catchall exception to hearsay."

Rule 807 of the Federal Rules of Evidence, called the Residual Exception, provides that hearsay statements that are not covered by another exception contained in Rule 803 or 804 may be admissible if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;

> (2) it is offered as evidence of a material fact;

> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). The residual exception "is a narrow exception that should not be construed broadly" because to do so "would easily cause the exception to swallow the rule." *United States v. Dunford*, 148 F.3d 385, 394 (4th Cir. 1998).

I find that the plaintiff cannot satisfy these criteria. Greenman's deposition testimony does not make clear the sources of the information conveyed in her emails. The information therefore has not been shown to be trustworthy. To the extent Latson gave her this information, Latson has been deposed and would be

able to testify at trial. There is no need for the information to be presented in the form of hearsay through Greenman's emails. The emails are not the most probative evidence available, and admitting them would not serve the interests of justice. Because Latson has not satisfied the requirements of Rule 807, the hearsay statements contained in Greenman's emails are not proper evidence to oppose the defendants' Motion for Summary Judgment, and I have disregarded them.

## II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

Summary judgment is not a "disfavored procedural shortcut," but an important mechanism for disposing of "claims and defenses [that] have no factual

basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks and citations omitted).

A. Statute of Limitations for ADA and RA Claims.

The ADA and RA claims, Counts Six and Seven of the Amended Complaint, are brought against VDOC. Latson claims that VDOC violated these statutes by failing to accommodate his disabilities. VDOC renews its invocation of the statute of limitations as to Latson's claims under the ADA and RA.

Given the similarities between the ADA and the RA, the same limitations period is applied to both causes of action. *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017).

Latson left MCTC on February 2, 2015. His action was filed in the United States District Court for the Eastern District of Virginia on April 21, 2016. The plaintiff does not dispute that his claims against VDOC accrued before February 2, 2015. The sole issue is whether a one-year period of limitations applies to bar those claims.

Because Title II of the ADA does not contain a statute of limitations, courts must either apply the federal four-year catch-all limitations period or the state statute of limitations for the most analogous state-law claim. *A Soc'y Without a*

*Name, for People Without a Home, Millennium Future-Present v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011).  The four-year federal catch-all period applies only to claims arising under statutes enacted after December 1, 1990, and the ADA was enacted a few months before that, on July 26, 1990.  *Id.*  Therefore, as a general rule, "the one-year limitations period in the Virginia [Rights of Persons with] Disabilities Act applies to ADA claims brought in Virginia."  *Id.* at 348.  The ADA was amended, however, in 2008.  ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (codified at 42 U.S.C. § 12102).  If Latson's claims were made possible by the ADA Amendments Act rather than the pre-amendment ADA, then he can invoke the four-year statute of limitations.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *Mercado v. Puerto Rico*, 814 F.3d 581, 589 (1st Cir. 2016).

Latson argues that his claims were made possible by the ADA Amendments Act because his ASD and ID are episodic in nature, and ASD and ID were not consistently recognized as disabilities under the original ADA.  The ADA Amendments Act broadened the definition of disability under both the ADA and the RA.  42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.").  The amendments to the ADA expressly included episodic impairments in the definition of disability

and provided that mitigating measures such as medication should not be considered in determining whether an impairment substantially limits a major life activity and thus qualifies as a disability. 42 U.S.C. § 12102(4)(D), (E). The term "disability" now includes "[a]n impairment that is *episodic or in remission*" if the impairment "would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(d) (emphasis added).

I find that Latson's ADA and RA claims were not made possible by the ADA Amendments Act, and he therefore cannot avail himself of the four-year catch-all limitations period. At least one district court found ASD to be a covered disability under the pre-amendment version of the ADA. *Jakubowski v. Christ Hosp.*, No. 1:08-CV-00141, 2009 WL 2407766, at *8-9 (S.D. Ohio Aug. 3, 2009). Latson has not pointed the court to any pre-amendment case in which a plaintiff with ASD was found not to be disabled because the ASD was episodic.

While the burden of establishing the affirmative defense of limitations lies with the defendants, *Goodman v. Paxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007), the undisputed record evidence indicates that Latson's ASD and ID are not episodic. Dr. Kraus opined that there were times when Latson's depression and anxiety worsened, but he clearly stated that depression and anxiety were separate

and distinct diagnoses from ASD and ID.[6]  Dr. Kraus contrasted the episodic nature of Latson's depression and anxiety with "the chronicity of his pervasive developmental disorder/his autistic spectrum diagnosis."  Kraus Report 20, ECF No. 202-21.  The fact that Latson had occasional outbursts and episodes of aggression related to his ASD does not render the condition of ASD itself episodic.  Rather, the evidence is clear that ASD and ID are lifelong disabilities that are ever-present and do not go into remission.

Because ASD and ID are not episodic and would have been recognized as disabilities under the pre-amendment version of the ADA, the applicable statute of limitations for Counts Six and Seven is the one-year limitations period of the Virginia Rights of Persons with Disabilities Act.  These counts are therefore time-barred, and I will grant VDOC's Motion for Summary Judgment as to Counts Six and Seven.

### B.  Section 1983 Claims.

#### 1.  *Qualified Immunity.*

A claim under 42 U.S.C. § 1983 requires proof of the following three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law."  *Jenkins v. Medford*,

---

[6]  Latson's ADA and RA claims are expressly based on his alleged disabilities of ASD and ID.  Am. Compl. ¶¶ 201, 211, ECF No. 92.

119 F.3d 1156, 1159–60 (4th Cir. 1997). While state officials sued in their official capacities are not "persons" under § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), state officials sued in their individual capacities are "persons" within the meaning of the statute and are not absolutely immune from suit, *Hafer v. Melo*, 502 U.S. 21, 31 (1991). A government official sued in his individual capacity under § 1983 may, however, be entitled to qualified immunity. *Id.* at 25 ("[O]fficials sued in their personal capacities . . . may assert personal immunity defenses such as objectively reasonable reliance on existing law.").

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Baltimore Cty.,* 713 F.3d 723, 731 (4th Cir. 2013). A defendant asserting qualified immunity has the burden of proving the defense. *Id.* Qualified immunity is immunity from suit rather than merely immunity from liability; therefore, the question of qualified immunity should be decided before trial. *Id.*

Each of Latson's § 1983 claims against Clarke, Jarvis, and Watson must be viewed through the lens of qualified immunity. A court deciding the applicability of qualified immunity must determine not only "whether a constitutional violation occurred" but also "whether the right violated was clearly established" at the time of the events in question. *Tobey v. Jones,* 706 F.3d 379, 385 (4th Cir. 2013). This

is so because "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (citations omitted). Courts are free to "skip ahead to the question whether the law clearly established that the [defendants'] conduct was unlawful in the circumstances of the case." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

A defendant cannot be said to have violated clearly established law unless "'existing precedent . . . placed the . . . constitutional question beyond debate.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The protection of qualified immunity extends to "all but the plainly incompetent or those who knowingly violate the law." *Raub*, 785 F.3d at 881 (citation omitted).

## 2. *Conditions of Confinement.*

Count One of the Amended Complaint alleges that the conditions of Latson's confinement at MCTC constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). It "imposes a duty on prison officials to 'provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citation omitted).

To sustain an unconstitutional conditions of confinement claim, a prisoner must show that: (1) objectively, he suffered a deprivation that was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). Conditions that do not violate the Eighth Amendment on their own may amount to cruel and unusual punishment when combined if "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise — for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

The facts of this case are similar to those considered in *Williams v. Branker*, 462 F. App'x 348 (4th Cir. 2012) (unpublished), issued two and a half years before Latson's arrival at MCTC. The prisoner in *Williams* was mentally ill and housed in segregation. *Id.* at 350. He was given only one hour per day, five days per week of out-of-cell time. *Id.* He had limited access to reading materials, was not permitted to watch television, and had not been granted outdoor recreation for

several years. *Id.* Like Latson, he argued that he was being punished for manifestations of his mental illness and that his conditions had a detrimental effect on his mental health. *Id.* at 351.

The *Williams* court found that the inmate's conditions were no different than those previously upheld in *Mickle v. Moore (In re Long Term Administrative Segregation of Inmates Designated as Five Percenters)*, 174 F.3d 464, 472 (4th Cir. 1999). *Williams*, 462 F. App'x at 354. The court stated that "[t]he fact that the conditions to which [the prisoner] was subjected aggravated his mental illness is an unfortunate but inevitable result of his incarceration." *Id.* "[W]e cannot conclude that such aggravation amounts to the denial of a minimal civilized necessity, especially when the conditions alleged to have caused that aggravation clearly meet or exceed minimal standards." *Id.*

More recent appellate decisions from other circuits, such as *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017), suggest a change in how courts are viewing prisons' use of restrictive housing for mentally ill inmates. In *Palakovic*, the plaintiffs' son had died of suicide after being placed in restrictive housing. *Id.* at 216. He, too, had been "permitted just one hour of exercise five days out of each week, which took place in an outdoor cage only slightly larger than his cell." *Id.* at 217. In overturning the district court's dismissal of the plaintiffs' conditions of confinement claim, the Third Circuit "acknowledge[d] the robust body of legal and

scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement." *Id.* at 225. The court noted a "growing consensus . . . that conditions like those to which [the decedent] repeatedly was subjected can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity." *Id.*

"[T]he Eighth Amendment's prohibition of cruel and unusual punishments draws its meaning from the evolving standards of decency that mark the progress of a maturing society, and so admits of few absolute limitations." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (internal quotation marks, citations, and alterations omitted). Latson argues, therefore, that the conditions to which he was subjected and which have withstood Eighth Amendment scrutiny in the past can be found to constitute cruel and unusual punishment by today's standards. Unfortunately for Latson, the qualified immunity inquiry looks not to evolving standards of decency but to clearly established law. Given the state of the law, the defendants cannot be said to have violated clearly established law in 2014 and 2015 by placing Latson in restrictive housing and subjecting him to the conditions

described above.  I find that the defendants are entitled to qualified immunity on

Count One, and I will grant their Motion for Summary Judgment as to that count.[7]

### 3. *Inadequacy of Medical Treatment.*

In Count Two, Latson contends that the defendants violated the Eighth

Amendment by failing to provide him adequate medical care.  "[A] prison

official's 'deliberate indifference to serious medical needs of prisoners constitutes

the unnecessary and wanton infliction of pain proscribed by the Eighth

Amendment.'"  *Scinto*, 841 F.3d at 225 (citation omitted).  "The plaintiff must

show that he had serious medical needs, which is an objective inquiry, and that the

defendant acted with deliberate indifference to those needs, which is a subjective

inquiry."  *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017).

The deliberate indifference inquiry "sets a particularly high bar to recovery."  *Iko

v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Evidence of professional negligence

or disagreement with a course of treatment is insufficient to establish a violation of

the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Jackson v.

Lightsey*, 775 F.3d 170, 178-79 (4th Cir. 2014).

---

[7]  To the extent that Count One seeks to hold Clarke liable for the conditions at Rappahannock such as the restraint chair incident, I find that the record contains no evidence that Clarke was aware of the details of Latson's confinement at Rappahannock prior to when he made arrangements for Latson to be transferred to a VDOC facility. Therefore, there is no factual basis on which to hold Clarke liable for not removing Latson from Rappahannock sooner than he did.

"[T]he mere fact that prison officials provide some treatment does not mean they have provided '*constitutionally adequate*' treatment." *Heyer*, 849 F.3d at 211 (citation omitted). The treatment provided by a prison must be adequate to address the prisoner's serious medical need. *Id.* Prison officials who are not medical providers can exhibit deliberate indifference to serious medical needs by intentionally denying access to care or intentionally interfering with prescribed treatment. *Estelle*, 429 U.S. at 104-05.

The defendants do not contest that Latson has serious medical needs. They argue that the undisputed facts fail to establish their deliberate indifference to those needs. I agree. The defendants — Clarke, Jarvis, and Watson — are not medical professionals and were not part of Latson's treatment team. There is no evidence that they intentionally interfered with treatment prescribed by the treatment team or denied Latson access to necessary treatment. The only suggestion of interference in the record is Dr. Horst's testimony that had she ordered that Latson be given more books or other stimuli, those orders would not have been followed due to concerns about security. That testimony is speculative, however, and does not show that the defendants interfered with any actual directive from Latson's treating professionals.

The plaintiff seems to argue that the very act of placing him in restrictive housing was meant to interfere with his treatment, but the evidence does not

support that assertion.  Latson was visited by nurses and dispensed medication nearly every day while he was in restrictive housing, and he met with recreational therapists and members of his treatment team even while he was in prehearing detention and disciplinary segregation, the most restrictive housing statuses.  It is undisputed that Latson received medical and mental health treatment throughout his time at MCTC, even when he was in restrictive housing.  Latson contends that the treatment he received was grossly inadequate, but again, the defendants he has named are not medical or mental health professionals and were not the people prescribing or providing that treatment.  Moreover, at least as of the time of these events, there was "no authority for the proposition that the Eighth Amendment entitle[d] [prisoners] to effective treatment, or that [V]DOC is a guarantor of mental health."  *Williams*, 462 F. App'x at 354 (internal quotation marks and citation omitted).

The plaintiff contends that the members of Latson's treatment team were inadequately trained to treat an inmate with ASD.  While failure to train can serve as a basis for § 1983 liability, *see City of Canton v. Harris*, 489 U.S. 378, 380 (1989), the Amended Complaint did not assert a failure-to-train claim.  Even if Latson had brought such a claim, it was not clearly established as of 2014 that the Director of VDOC and MCTC's Warden and Assistant Warden — nonmedical prison officials — had a duty to train medical professionals on how to work with

inmates who have a particular medical diagnosis like ASD. The plaintiff has pointed this court to no case that would have required such training. Moreover, the undisputed facts show that at least one professional who saw Latson frequently, Dr. McGrady, had significant experience and training with respect to treating patients with ASD. Although Dr. McGrady was not considered a member of Latson's treatment team, she saw him nearly daily when making rounds, consulted on his care, and supervised Armes, who assessed Latson, worked extensively with him, and designed his SRPs.

Watson, Jarvis, and Clarke cannot be liable for the treatment team's acts or omissions under a respondeat superior theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). They can only be held responsible under § 1983 based on their own actions. *Danser v. Stansberry*, 772 F.3d 340, 349 (4th Cir. 2014). There is scant evidence in the record of Clarke's actions with regard to Latson's treatment at MCTC. While Watson and Jarvis approved Latson's SRPs, Armes, a mental health professional, designed them. Although the defendants received emails from attorney Greenman conveying what she found concerning about Latson's treatment at MCTC, they had a right to rely on the assessments of their medical professional colleagues, who were working with Latson at MCTC, over the opinions and recommendations of Latson's attorney-advocate who was relaying second-hand information. As the Third Circuit has aptly explained:

> If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.
>
> . . . [A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

*Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). The defendants were entitled to defer to medical and mental health staff as to Latson's treatment, and the record evidence does not establish that the defendants had reason to believe that the treatment team was mistreating or failing to treat Latson. Because the undisputed facts fail to demonstrate that the defendants acted with deliberate indifference to Latson's serious medical needs, Clarke, Jarvis, and Watson are entitled to summary judgment as to Count Two.

### 4. *Due Process.*

In Count Three, Latson contends that the defendants violated his Fourteenth Amendment procedural due process rights by placing him in restrictive housing without first giving him a hearing and by preventing his attorney from helping him

draft a grievance. To state a procedural due process claim, a plaintiff must allege facts showing that (1) he had a protectable liberty interest, and (2) he was not afforded minimally adequate process to protect his liberty interest. *Incumaa v. Stirling*, 791 F.3d 517, 526 (4th Cir. 2015). Prisoners have an interest in avoiding hardships that are "atypical and significant . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Although the constitution itself does not create a protected interest in avoiding specific prison conditions, "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations." *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005).

In *Wilkinson*, the Supreme Court found that certain conditions of segregated confinement which "standing alone might not be sufficient to create a liberty interest, taken together . . . impose an atypical and significant hardship within the correctional context." 545 U.S. at 224. Therefore, the conditions alleged gave rise to a protected liberty interest. *Id.* In reaching this conclusion, the *Wilkinson* Court focused on the severe limitation of human contact for a prisoner in segregation, the fact that placement in segregation was indefinite, and the fact that placement in segregation disqualified inmates from parole eligibility. *Id.* However, the Court found that the state's policy regarding placement of prisoners in segregation provided sufficient procedural protection of the prisoner's protected liberty

interest. *Id.* The Court noted that the policy offered the inmate notice of the reasons he was being placed in segregation and an opportunity to rebut those reasons. *Id.* at 226-27. The policy also provided multiple levels of review of decisions recommending segregation, as well as a review thirty days after an inmate's placement into segregation. *Id.* at 227.

The Fourth Circuit has held that in order to state a procedural due process claim, "inmates must first establish that an interest in avoiding onerous or restrictive confinement conditions arises from state policies or regulations (e.g., a regulation mandating periodic review)." *Incumaa*, 791 F.3d at 527 (internal quotation marks, alterations and citation omitted). Once the prisoner has cleared that hurdle, the next question — whether the alleged conditions are atypical and substantially harsh — is a fact-specific one. *Id.* The court must first determine the ordinary incidents of prison life for the particular inmate, and then the court must determine whether the alleged "conditions impose atypical and substantial hardship in relation to that norm." *Id.* If the plaintiff establishes a protected liberty interest, the court must then determine what process was required in order to deprive the plaintiff of that interest. *See id.* at 532.

To resolve the defendants' challenge to Count Three, a thorough examination of the various hearings, policies, and housing statuses is necessary. Latson appears to have been in some form of restrictive housing during the entire

time he was at Rappahannock. The record does not indicate that he was ever housed in the general population there. When he was moved to MCTC and placed first in general detention, then in administrative segregation, the conditions of his confinement were not any worse than when he was housed in administrative segregation at Rappahannock immediately before his transfer.[8]

Latson arrived at MCTC on June 5, 2014, and an ICA Hearing was held on June 11, 2014, to determine an appropriate housing status. A hearing report states that Latson was present at the hearing. The report says that "the Residential Team requests Continued Restrictive Housing at this time in order to complete classification and assessments and to formulate a comprehensive treatment plan." Mem. Supp. Defs.' Mot. Summ. J. Ex. 16, ECF No. 182-17. Watson recommended that Latson's status be changed to administrative segregation to allow more time for the treatment team to evaluate Latson. Jarvis approved the status change.

Another ICA Hearing took place on June 26, 2014, to consider the treatment team's recommendation of an SRP. Latson was present at the hearing. The report states:

---

[8] There is little record evidence regarding the restrictions placed on inmates in administrative segregation at Rappahannock. Latson does not argue, however, that the conditions of his confinement during his first weeks at MCTC were harsher or meaningfully different than when he was housed in administrative segregation at Rappahannock.

> Although [Latson] has a significant history of aggression, he has demonstrated appropriate behavior since his arrival, has been medication-compliant, and has ben [sic] behaviorally controlled. The Residential Team requests continued Restrictive Housing at this time, but with a cautions [sic] partial (SRP) release to one of the RTU wings to better gauge his integration potential.

*Id*. Watson recommended a status change to administrative segregation and implementation of an SRP. Jarvis approved the recommendation.

Four days after the SRP was implemented, it was suspended on June 30, 2014, for misbehavior that did not result in a charge. No ICA Hearing was held regarding the suspension of Latson's first SRP.

The record contains a Disciplinary Offense Report regarding the July 11, 2014, incident in which Latson hit an officer with a tray through the tray slot. Sergeant Cullop signed that he had served the report on Latson and that Latson refused to sign the report. Cullop marked Latson's responses to a series of questions. According to the report, Latson indicated that he did not request a staff or offender advisor to assist him at the hearing, that he did wish to request witnesses, and that he did not wish to request documentary evidence. Latson indicated that he wished to waive his right to 24 hours of preparation time prior to a hearing and that he did not wish to appear at the disciplinary hearing. The report contained several statements regarding Latson's rights, including that he had the

right to question the reporting officer and the right to remain silent.  The report is dated July 11, 2014.

The next page of the report states that a hearing took place on July 21, 2014, and that the reporting officer was not present.  The report states that Latson accepted a penalty offer, thereby pleading guilty.  The agreed penalty was 20 days in disciplinary segregation.  The hearing officer was A.L. Doss.  The form indicates that Latson was in pre-hearing detention from July 11 until July 20 and in isolation from July 21 until July 30, for a total of 20 days in segregation.  Watson approved the penalty.  Latson signed a separate penalty offer form to acknowledge that he had been advised of his rights and signed a second time to show his acceptance of the offer.  The penalty offer form stated that he was waiving his right to a hearing and pleading guilty.   On August 11, 2014, Latson signed the form to indicate that he had received a copy and had been advised of his right to appeal.

Armes completed a Discipline – Offender Mental Health Assessment on July 11, 2014, the date of the incident, and found that Latson could be held responsible for the offense, that his disability did not impair his understanding of the penalty offer, that he was capable of effectively participating in a hearing, and that disciplinary segregation would not be detrimental to his mental status.  The assessment was received and signed by Lieutenant Olinger.

On July 15, 2014, four days after the incident and six days before the disciplinary hearing, Watson held an ICA Hearing at which Latson was present. The report of the ICA Hearing notes that the treatment team requested that Latson remain in segregation until his disciplinary hearing because of his two incidents of aggression while at MCTC.

Latson's memory of these events is hazy. At his deposition, when asked if the signatures on the forms were his signatures, he replied, "I don't know." Latson Dep. 147, ECF No. 202-7. He was asked, "Do you remember anybody talking to you about whether or not to accept the penalty from the July 11, 2014, event? Any correctional officer or treatment officer?" He responded, "I don't remember." *Id.* When asked, "Do you remember taking the penalty rather than having a hearing?," he replied, "I don't remember." *Id.* I find that these answers do not create any genuine issue of material fact because they do not satisfy Latson's duty to produce affirmative evidence disputing the defendants' version of events.

On August 7, 2014, an ICA Hearing was held to consider a proposed SRP. Latson was present at the hearing. Watson recommended implementation of the proposed SRP, and Jarvis approved the recommendation. On September 9, 2014, another ICA Hearing was held to consider a proposal to increase the amount of time on a residential wing allowed by Latson's SRP. Latson was present at this

hearing as well.  Watson recommended the treatment team's proposed changes to the SRP, and Jarvis approved the changes.

On September 18, 2014, at the request of the treatment team, another ICA Hearing was held to consider releasing Latson into general population.  Latson was present at the hearing and indicated his readiness to be released into general population.  Watson concurred in the treatment team's recommendation, and Jarvis approved the status change.

A Disciplinary Offense Report regarding the October 5, 2014, spitting incident states that at a disciplinary hearing on October 8, Latson pleaded guilty and was penalized with 20 days in disciplinary segregation.  The report indicates that Latson refused to sign to acknowledge his receipt of the report and would not accept a copy of it.  On the corresponding penalty offer form, Latson signed to acknowledge that he had been advised of his rights, but he did not accept the penalty offer of 20 days of disciplinary segregation and chose to proceed to a hearing.  Armes again completed a Discipline – Offender Mental Health Assessment on October 6 and made the same findings that he had made on July 11 regarding Latson's competence.  As a result of the spitting incident, Latson was placed in pre-hearing detention from October 5 through October 8 and was then placed in disciplinary segregation through October 24, for a total of 20 days in segregation.

The day before his disciplinary hearing, an ICA Hearing was held on October 7, 2014, to consider Latson's placement in pre-hearing detention for the spitting incident. Latson was present and indicated that he did not want to remain in detention. However, the treatment team recommended that he remain in pre-hearing detention until his disciplinary hearing. Watson adopted that recommendation, and Jarvis approved it.

An ICA Hearing took place on October 21, 2014, to address a status change from pre-hearing detention to general detention that had occurred on October 19, 2014. Latson was present and indicated a desire to return to wing 1D. The treatment team recommended that he remain in segregation because attempts to move him into general population had been unsuccessful. Watson concurred and recommended that his status be changed to administrative segregation. Jarvis approved this status change.

On November 20, 2014, an ICA Hearing was held to consider a proposed SRP. Latson was present and stated that upon being released into general population, he wanted to be productive by working and attending school. Watson recommended approval of the proposed SRP, and Jarvis approved it. On December 4, 2014, an ICA Hearing was held to consider expanding Latson's SRP. Latson attended the hearing and asked when he could start the new SRP. Watson recommended approval of the proposed changes and Jarvis approved.

On December 11, 2014, an ICA Hearing was held to consider releasing Latson into general population. Latson attended the hearing and stated that he was ready to be released from restrictive housing. Watson recommended release into general population, which Jarvis approved.

On January 23, 2015, an ICA Hearing was held regarding Latson's move from general population to general detention pending his release from custody. Watson had placed him in general detention the day before. The ICA for this hearing was Vickie O. Williams. Williams recommended a change to administrative segregation, noting that Latson was placed in detention for his safety until his release within two weeks. Watson reviewed and approved the recommendation.

VDOC's Special Housing Operating Procedure defines general detention status as "[s]pecial purpose bed assignments, utilized under proper administrative process, for the immediate secure confinement of offenders pending review for an appropriate assignment." Mem. Supp. Defs.' Mot. Summ. J. Ex. 5 at 1, ECF No. 187. Disciplinary segregation is defined as "'[s]pecial purpose bed assignments, in which the offender is confined without privileges – imposed by the Hearings Officer as a penalty for conviction of a disciplinary offense." Id. Pre-hearing detention is defined as "[s]pecial purpose bed assignments, utilized under proper administrative process, for the immediate confinement of offenders who have been

charged with an offense under the Offender Disciplinary Procedure, are awaiting a Disciplinary Hearing, and are considered to be a potential threat to persons or property, or for escape." *Id.* at 1-2. Segregation is defined as "[s]pecial purpose bed assignments operated under maximum security regulations and procedures, and utilized under proper administrative process, for the personal protection or custodial management of offenders." *Id.* at 2.

The procedure states that assignment to a special housing status other than general detention, pre-hearing detention, or disciplinary segregation "requires a formal due process hearing and action by the Institutional Classification Authority (ICA)." *Id.* at 5. This requirement would apply to administrative segregation.

> Every seven days of an offender's first two months in Special Housing and every 30 days thereafter, the Special Housing Unit Supervisor or designee will perform a *Weekly Special Housing Status Review* of all offenders assigned to the Special Housing Unit to monitor the appropriateness of these statuses. . . . If a formal review of the offender's status is warranted, the offender will be served notice of a hearing . . . .

*Id.* at 5. The policy further provides that "[o]ffenders should be screened by a Qualified Mental Health Professional (QMHP) before their placement or within one working day after placement in special housing so any 'at risk' offenders may be identified." *Id.*

According to the policy, "[s]pecial housing units provide living conditions that approximate those of the general offender population . . . . Special housing

cells/rooms permit the offenders assigned to them to converse with and be observed by staff members." *Id.* at 6. "Within the resources available to the facility, unless security or safety considerations dictate otherwise, offenders in special housing have access to educational services, commissary services, library services, social services, counseling services, religious guidance, and recreational programs." *Id.* "A QMHP will personally interview . . . any offender remaining in special housing for more than 30 days. If confinement continues beyond 30 days, a mental health assessment by a QMHP is made at least every three months and more frequently if prescribed by the chief medical authority." *Id.* at 7. "Special housing offenders should be allowed a minimum of one hour of out of cell exercise five separate days per week in a supervised area, unless security or safety considerations dictate otherwise." *Id.* at 10.

"An offender may not be held in General Detention for longer than three working days. Unless assigned to a new housing status by the ICA, the offender will revert to the previous housing assignment after three working days in General Detention." *Id.* at 11. "The ICA may assign an offender to Segregation for investigation of the matter that caused the offender to be placed on General Detention. An offender may not be held in investigative status beyond 15 work days unless they are being investigated by the Special Investigations Unit." *Id.* The policy states that an offender can be placed in pre-hearing detention when he

has been charged with an offense and is awaiting a disciplinary hearing, and he is considered a potential threat to persons or property. Placement in pre-hearing detention must be reviewed by the ICA within three working days. "The maximum total period in Pre-Hearing Detention shall not exceed fifteen days." *Id.*

"Offenders may only be assigned to segregation by the ICA after a due process hearing . . . ." *Id.* at 13. "During the assignment to Segregation, the offender status will be formally reviewed by the ICA at least once every 90 days." *Id.*

The Facility Classification Management Operating Procedure defines Formal Due Process Hearing as:

> A classification hearing that requires a prior formal notification to the offender indicating the reason for, purpose of, and possible results of the classification hearing, the offender's right to be present at the hearing, and notice of the results of the hearing and the reason for the decision. A formal due process hearing is required when an offender is considered for removal from general population, or faces the possibility of increase in security level or reduction in good time earning level outside the Annual Review Cycle.

Mem. Supp. Defs.' Mot. Summ. J. Ex. 51 at 1, ECF No. 187-21. "The facility is required to provide, at a minimum, 48 hour written notification to the offender of a scheduled formal due process hearing using the *Institutional Classification Authority Hearing Notification* . . . ." *Id.* An ICA Hearing is defined as "[a]n offender case review conducted by the Institutional Classification Authority; these

hearings may be either formal due process, or informal hearings depending on the purpose of the review." *Id.* at 2. An informal hearing is "[a] classification hearing which does not require advance notification to the offender of the hearing except for involuntary removals from a job or program assignment." *Id.* A formal due process hearing is required "whenever there is the opportunity for the offender to be removed from general population status." *Id.* Assignments to segregation and pre-hearing detention also require formal due process hearings. The policy does not state that suspension of an SRP requires a hearing.

Latson's due process complaints essentially amount to three alleged shortcomings: (1) He was not given a hearing immediately upon arriving at MCTC, and his initial ICA Hearing occurred six days after his arrival rather than the three days required by policy; (2) he did not really understand what was happening during the hearings and was not able to effectively advocate for himself; and (3) Watson prevented Latson's attorney from assisting him in completing a grievance form when she visited on October 3, while he was housed in general population.

As to the initial hearing, I must first determine whether Latson had a protected liberty interest in avoiding restrictive housing. This interest must arise from a state policy or regulation. *See Incumaa*, 791 F.3d at 527. I find that the Special Housing Operating Procedure and the Facility Classification Management

Operating Procedure are state policies that create a protected liberty interest in avoiding placement in restrictive housing absent certain procedural protections.

The parties disagree on the baseline against which to compare the conditions of Latson's confinement in restrictive housing. The defendants argue that because Latson was in restrictive housing for most of his period of incarceration, the conditions of restrictive housing constitute the ordinary incidents of prison life for him. Latson argues that his conditions should be compared to general population, as that was the goal toward which everyone was working. Latson was not sentenced to any particular housing status, and he was able to be housed in general population for at least part of his time at MCTC. *Compare Prieto v. Clarke*, 780 F.3d 245, 252 (4th Cir. 2015) (holding that inmates specifically sentenced to death row had no liberty interest in being housed in a less restrictive environment; thus, general population was not the appropriate baseline for them). Therefore, I conclude that Latson's baseline was general population, even though he spent a relatively small percentage of his time there.

The undisputed facts show that inmates in general population can have more personal property in their cells, enjoy more out-of-cell time, can watch television more often, and have greater opportunities to interact with other inmates than offenders in restrictive housing. In comparison to the general population baseline, restrictive housing imposed atypical and significant hardships in the form of

significant reduction in stimulus and interaction with other inmates, which had an unusually harsh effect on Latson because of his disabilities.[9]  Therefore, Latson has established a liberty interest in avoiding restrictive housing, and he was entitled to some amount of process when being deprived of that interest.

Latson, however, received all the process that was due to him under the Fourteenth Amendment.  In making this determination, I apply the three factors set forth in *Mathews v. Eldridge*: (1) Latson's private interest in avoiding restrictive housing; (2) the risk that Latson could be deprived of that interest erroneously under the procedures in place, and the likely value of additional procedural safeguards; and (3) the state's interest, including the fiscal and administrative burdens of additional processes.  424 U.S. 319, 335 (1976); *Incumaa*, 791 F.3d at 532.

As a prisoner, Latson's liberty was already curtailed, and his private interest must be viewed within the context of the prison system.  *See Wilkinson*, 545, U.S. at 225.  Given his disabilities and restrictive housing's particular impact on him, I find that Latson had a significant interest in avoiding placement in restrictive housing.  But the procedures in place adequately guarded against the risk that he could be erroneously deprived of that interest, and additional procedures would

_____

[9]  I do not find that every prisoner has a liberty interest in avoiding restrictive housing in every case.  My holding regarding Latson's liberty interest in avoiding restrictive housing is limited to the facts of this case.

have provided little added protection against him being placed in restrictive housing in error. Latson was given the basic requirements of due process: notice and an opportunity to be heard. *See id*. at 225-26.

Latson was present and able to participate at each ICA Hearing. His treatment team made recommendations about his placements, and they could have assisted him in expressing his desires and concerns if he felt unable to do so on his own. ICA Hearings to consider Latson's housing status and SRPs were held frequently during Latson's relatively short period of incarceration. Recommendations of Watson were reviewed and approved by Jarvis.

In advance of each disciplinary hearing, Latson was given a report explaining the charges against him and advising him of his rights, including his right to be present at the hearing and to call witnesses. Armes, a psychology associate who worked extensively with Latson, assessed his competency before each disciplinary hearing. His findings included that Latson was mentally capable of effectively participating in a hearing. The hearings took place within a reasonable amount of time following each incident.

Latson asserts that he did not understand what was happening in the hearings, but the record evidence demonstrates that he had the ability to participate and ask questions, which he did in fact do. Latson has not proposed additional procedural safeguards that should have been implemented. In any event, in the

prison context, the state has an interest in avoiding additional procedural burdens that take staff attention and resources away from the security and operation of the prison, particularly where those burdens are unlikely to significantly protect against incorrect disciplinary action. It is important to note that here, Latson pled guilty to the disciplinary charges and did not dispute that he had conducted himself as charged. I conclude that the notice and hearings provided to Latson were sufficient to satisfy his right to due process under the Fourteenth Amendment.

Latson has not pointed to any state law, regulation, or policy that would have required a hearing before he could be placed in general detention upon his arrival, and I cannot conclude that the Due Process Clause required such a pre-detention hearing. Latson's initial placement in restrictive housing did not constitute any meaningful departure from the conditions in which he was housed in administrative segregation at Rappahannock. The realities of prison administration required that Latson be segregated while he was being assessed to reduce the risk of harm to Latson or others that could have resulted from placing him immediately into general population without fully understanding his needs.

VDOC policy did require a hearing within three working days of Latson's placement in general detention, and it is undisputed that the hearing was held at

least two days late.[10]  I find, however, that the delay of several days before this first hearing was de minimis, particularly given that Latson's conditions did not meaningfully change either when he was transferred from administrative segregation at Rappahannock to general detention at MCTC or when his housing status was changed from pre-hearing detention to administrative segregation following the hearing.  *See Riccio v. Cty. of Fairfax,* 907 F.2d 1459, 1469 (holding that not every violation of state-created procedures amounts to a federal due process violation).  This delay of several days did not amount to a constitutional violation.

As to the June 30, 2014, termination of Latson's SRP without a hearing, I find that Latson did not have any protected liberty interest in his SRP.  No state policy or regulation required him to be granted an SRP or mandated a hearing before it could be suspended or terminated.  His housing status remained administrative segregation after the SRP was suspended.  The SRP was suspended for only one week, and during that time he was given the opportunity to shower on two days and to leave his cell for recreation on two different days.  He refused the offers of recreation and one shower, but he left his cell once to shower, had mail delivered, had his cell cleaned, got a haircut, made one phone call, received one phone call, and was observed reading on two occasions while his SRP was

---

[10]  June 5, 2014, was a Thursday, and June 11, 2014, was a Wednesday.

suspended.  Therefore, even if a policy or regulation had created a protected liberty interest in an SRP, the relatively short suspension of it here was de minimis and did not cause an atypical, significant deprivation.

Finally, Watson's unwillingness to allow Latson's attorney to complete a grievance form for Latson did not violate his procedural due process rights.  At the time of the attorney's visit, Latson was housed in general population and no move to restrictive housing was being considered.[11]  The attorney states in her declaration that to the best of her recollection, Latson wanted to complain about the number of hours he was confined to his cell and restrictions on the personal property he was allowed to have in his possession.  If his contemplated grievance arose out of his placement in restrictive housing, it would have pertained to a previous placement that had already terminated.   Having viewed Latson's handwriting on several exhibits, I agree with the plaintiff that it would have been difficult for him to complete a grievance form in his own hand, but it is undisputed that he could have requested assistance from MCTC staff.  Latson claims that his fear of the guards prevented him from doing so, but nothing would have kept him from requesting the assistance of Guerry, Armes, another member of his treatment

_____

[11]   Latson was moved back to restrictive housing two days later, on October 5, after committing a disciplinary infraction.

team, or even another inmate. The record evidence does not establish that the defendants prevented Latson from filing a grievance.

I find that the undisputed facts do not show any violation of Latson's procedural due process rights. But even if Latson had arguably shown a Fourteenth Amendment Due Process violation, the defendants did not violate any clearly established law because there was no case law in 2014 holding that they were required to provide any additional procedural protections beyond what they provided. Because the defendants provided Latson with adequate process to protect his liberty interest, and because they are entitled to qualified immunity as to this claim, I will grant the defendants' Motion for Summary Judgment as to Count III.

## 5. *First Amendment.*

Count Five of the Amended Complaint claims that Watson and Clarke retaliated against Latson for exercising his First Amendment right to communicate with his attorney, his family, and the Governor by placing him in restrictive housing following his conditional pardon. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To succeed on his First Amendment retaliation claim, Latson must show that (1) he engaged in

constitutionally protected speech, (2) the defendants took retaliatory action that adversely affected Latson's protected speech, and (3) "a causal relationship exists between [Latson's] speech and the [defendants'] retaliatory action." *Tobey,* 706 F.3d at 387. "Claims of retaliation by prisoners must 'be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in penal institutions.'" *Patton v. Kimble*, 717 F. App'x 271, 272 (4th Cir. 2018) (unpublished) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)) (internal alteration omitted).

An inmate has a First Amendment right to communicate with counsel. *Al-Amin v. Smith*, 511 F.3d 1317, 1333-34 (11th Cir. 2008). The First Amendment also protects an inmate's right to send non-legal personal correspondence. *See, e.g.*, *Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1209 (9th Cir. 2017); *Berenguel v. Bell*, 283 F. App'x 293, 295 (5th Cir. 2008) (unpublished). Latson has therefore established the first element of his First Amendment retaliation claim, that he engaged in protected speech.

To establish that the defendants' alleged retaliatory action adversely affected Latson's speech, Latson must show that "a similarly situated person of ordinary firmness reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." *Blankenship v. Manchin*, 471 F.3d 523, 530 (4th Cir. 2006) (internal quotation marks and citations omitted). This is a

fact-sensitive inquiry that requires the court to consider "the status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Id.* (internal quotation marks and citation omitted). "[A] chill is likely when the state actor has engaged the punitive machinery of the government in order to punish an individual for speaking out." *Ruttenberg v. Jones,* 283 F. App'x 121, 130 (4th Cir. 2008) (unpublished) (internal quotation marks and citations omitted).

The undisputed facts show that following his pardon, Latson was removed from general population and placed in restrictive housing. Latson testified that for several days after he was conditionally pardoned, his privileges were limited and his personal property was taken from him. He did not initially have access to books or other stimuli. I find that Latson has proffered evidence tending to show that placing him in restrictive housing, revoking his privileges, and taking his personal property from him would chill the speech of an ordinary person in his circumstances. He has thus satisfied the second element of First Amendment retaliation.

Latson must also show that but for his exercise of his First Amendment rights, Watson and Clarke would not have revoked his privileges and placed him in restrictive housing following his pardon. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) (explaining that "retaliation is subject to recovery as the but-for cause

of official action offending the Constitution"); *Tobey*, 706 F.3d at 390–91.  On this element, Latson's claim fails.  He has not produced evidence sufficient to rebut Watson's testimony that she placed Latson in administrative segregation for his own protection until she could secure a full wing for him to occupy while he awaited release from MCTC.  The record contains evidence that other VDOC inmates at different facilities who were pardoned were also placed in isolation while awaiting release and that the general practice was to house pardoned individuals by themselves for their protection.  While Watson made the decision to remove Latson from general detention upon his conditional pardon, Lyons recommended on January 22, 2015, two days later, that Latson remain in general detention until his release, for his safety.  Aside from Latson's testimony suggesting that certain guards did not like him, mistreated him at various points during his time at MCTC, and were skeptical of the extent of his disabilities, there is no record evidence suggesting that anyone — particularly the defendants here, Watson or Clarke — had any motive to retaliate against Latson for communicating with Greenman, his mother, or the Governor.  He simply cannot satisfy the but-for causation requirement for First Amendment retaliation.

Because Latson has failed to adduce evidence sufficient to satisfy the causation requirement of a First Amendment retaliation claim, the defendants are

entitled to qualified immunity on Count Five, and I will grant their Motion for Summary Judgment.

III.

For the foregoing reasons, it is **ORDERED** that the Motion for Summary Judgment, ECF No. 180, is GRANTED.  A separate Judgment will be entered herewith.

ENTER:  November 6, 2018

/s/  James P. Jones_____
United States District Judge